O. P. LeComte v. A. B. Pennock *et al.*

No. 11,398.   (59 Pac. 641.)

1. Conveyance—*Equitable Mortgage.* An instrument in form an absolute conveyance of real estate, given to secure the payment of a debt, is no more than an equitable mortgage, and nothing but a new agreement can convert it into a deed or transfer of title.

2. ———— *Conveyance by Grantee Void.* A deed, executed by the person to whom such instrument or security is given to one who has notice of the character of the instrument and of the relations between the parties to it, does not convey title to the property.

3. ———— *Grantor not Estopped.* From the facts found by the jury, it is *held*, that the mortgagor had not surrendered his equity of redemption, and was not estopped to assert it.

Error from Cloud district court; F. W. Sturges, judge. Opinion filed January 6, 1900. Reversed.

*Pulsifer & Alexander*, for plaintiff in error.

*Theodore Laing*, for defendants in error.

The opinion of the court was delivered by

Johnston, J. : This was an action in the nature of ejectment brought by O. P. LeComte against A. B. Pennock, E. L. Prince, and the First National Bank of Concordia, Kansas, to recover real estate on which was situate a grain elevator. In 1894 LeCompte was

the owner of the property, and mortgaged the same to secure the payment of a loan of $1000 which he had obtained from the bank, and for which Norris Chartier had become surety.  In 1895 he executed another note to the bank for an additional $1000, with E. Chartier as surety, and as additional security he executed another mortgage on the elevator to the bank.  These mortgages were never recorded.  Later, in 1895, he and his wife executed to Norris Cartier an instrument in the form of a warranty deed, which upon its face purported to convey the property in question.  At the same time a defeasance was executed which in effect made the deed a mortgage. The deed was not given for the purpose of transferring the title, but was intended as a security for the payment of the debts hereinbefore mentioned, and for the protection of the sureties.  That was the understanding of all the parties to the transaction, including the president of the bank, who prepared the papers and witnessed their execution, and it appears that when executed they were deposited in the bank.

LeComte continued in possession of the property until October 26, 1896, but he was unsuccessful in business and failed to pay the indebtedness to the bank.  During this time he used the property and made such improvements and repairs on the same as he desired, and treated it in all respects as his own, and at no time did Chartier or the bank object to his use of the property or make any claim thereto.  In the fall of 1896 LeComte bought and shipped grain, and had an arrangement allowing him to pay for the grain purchased by checks on the bank, to meet which he deposited bills of lading for the grain shipped, and the profit, if any, was to be used in reducing his indebtedness to the bank.  On October 26, 1896, the

bank declined further to honor his checks for the grain and took possession of 5000 bushels of corn which he had, under a bill of sale given by him, and the elevator was used by the bank in handling and shipping the corn. At that time LeComte became dissipated, and was drinking and intoxicated much of the time. On November 10, 1896, the bank obtained from Norris Chartier and his wife a warranty deed purporting to convey the LeComte property to the bank, and it was filed for record on the same day. At that time the bank was aware that Chartier had only a lien on the property, and in order to obtain the instrument from Chartier the bank executed and delivered to him an indemnifying bond in the sum of $5000, conditioned to hold Chartier and wife harmless against any loss which might result from the execution and delivery of the instrument. On the next day the president of the bank prepared a quitclaim deed purporting to convey the property from LeComte to the bank, and made an unsuccessful effort to get Le Comte to execute the same, and no instrument has ever been made by him quitclaiming or transferring his interest in the property.

The bank claimed that on November 10, 1896, when the deed was made to the bank by Chartier, LeComte was told about it and made no objection, and, on the other hand, told them that he could do nothing more, and that later on the same day the president of the bank called on him and got him to assign the insurance which he held on the building, and that LeComte then informed the president that he could hold out no longer. Subsequently the bank, having possession of the elevator, attempted to sell the same to Pennock and Prince, who had notice of the relations between the parties and of the in-

terests held by each. Since that time they have used the property and spent a considerable sum in repairing the elevator. LeComte, being kept out of the possession of the property by the defendants, brought this action to recover the same. At the second trial the jury returned a general verdict for the defendant, together with answers to eighty-nine special questions, and from which most of the foregoing facts are obtained.

Complaint is made, and not without cause, that matters foreign to the issues formed by the pleadings were submitted, resulting in both confusion and prejudice. Although it was a statutory action for the recovery of real property, one of the theories on which the case was treated and tried was that the deed was a mortgage, and, if so, that it might be foreclosed. There was no hint in the pleadings that the defendants held a mortgage on the property or claimed a lien thereon, and after evidence of that character was permitted to be introduced no application was made to amend the pleadings. If it be granted that a party may foreclose a mortgage in an action brought to recover real property, it would appear to be necessary that the mortgage or lien should be pleaded. In addition to the mortgage indebtedness, the court tried questions as to taxes and insurance on the property. The matter of improvements made by the defendants was also considered and findings made thereon, although no adverse judgment had been rendered against them. The controlling questions of this review, however, arise upon the findings and undisputed facts.

Although the findings of the jury are inconsistent in some respects, they show beyond doubt that Le Comte has never by any conveyance transferred his

title or equity in the premises. The deed to Chartier, although in form an absolute conveyance, was, in fact, a mere security, and was so understood by every one connected with the transaction. It gave Chartier no more than a lien, and his conveyance did not give the bank any greater interest than he had obtained from LeComte. It is conceded that the deed was treated by Chartier and the bank throughout as a mortgage, and there was also a finding by the jury that at the time the bank took its deed from Chartier it knew that Chartier only held a lien on the property; but, despite these facts, the jury specifically found that the bank claimed title to the property through Chartier. It is a general rule that the character of a transaction is fixed at its inception, which is in line with the old maxim "once a mortgage, always a mortgage." The instrument given to Chartier was confessedly a mere equitable mortgage at the beginning, and nothing short of a new agreement could convert it into a deed or transfer of title. The facts disclosed in the record fail to show any such agreement, or a purpose to transfer the title, which, it is conceded, remained in LeComte at least until November 10, 1896. Has he since that time lost the title or estopped himself to claim it?

The defendants base their claim that he has, largely upon the assignment of the insurance on the buildings, which was signed by LeComte upon the day named, and at a time when the jury found that he was intoxicated. Waiving any question as to the application of the statute of frauds, we see nothing in or connected with that assignment indicating an intention to transfer the property to the bank or to surrender his equity; and this in effect was the finding of the jury. Although some testimony was offered to

show that LeComte tacitly consented to the transfer by Chartier to the bank, the jury found in answer to a question by the defendants that it was "not proven." Another question was whether he did not, on November 10, 1896, when informed that a deed had been made to the bank, tell the president that he was willing to do anything further that was wanted to complete the transfer of the property. Although there was testimony of that kind offered, the jury answered : "No transfer of property mentioned." In addition, there were the following questions and answers as to the assignment of the insurance :

"Q. Was not the making of such assignment made as part of the transaction and connected with the giving of the deed by Chartier? A. We are unable to answer.

"Q. Was not the making of such assignment meant by LeComte as part of the transfer of title and possession of elevator to bank? A. We are unable to answer."

This was the claim and the testimony of the defendants, and these answers of the jury are to be treated as the equivalent of negative answers. (*Morrow et al. v. Comm'rs of Saline Co.*, 21 Kan. 484.) So construed, they are inconsistent with some other findings of the jury, and with the general verdict.

Again, the jury found that the bank never surrendered or offered to surrender the notes given by Le Comte to it, nor did it ever charge off LeComte's indebtedness to the bank as evidenced by the notes until some time afterward, and not until after the bank had attempted to sell the property to another. A debt is an essential requisite of a mortgage, and the fact that the notes were not surrendered or canceled indicates that the bank was unwilling to treat the debt as extinguished or to rest its right upon the

so-called transfer of title. If the indebtedness be not canceled, equity treats the instrument as a mortgage, whether the grantee so regards it or not. In this case, the bank appears to have been endeavoring to hold the land absolutely and also the right to enforce the payment of the debt in case it turned out that the title still remained in LeComte.

Another circumstance throwing considerable light on the transaction is that on November 11, 1896, the bank, through its president, prepared a quitclaim deed, naming LeComte and his wife as grantors and the bank as grantee, and subsequently, and at different times, endeavored to obtain LeComte's signature thereto, but he refused to execute the deed, and, as the jury found, has never made any instrument or writing for the purpose of transferring his interest or equity in the property. It is also found that the assignment of the insurance, upon which so much reliance is placed, was made without consideration. The findings and the facts make it very clear that the bank has a lien on the property in question, and nothing more, and that LeComte has never conveyed his equity of redemption, nor estopped himself to assert it. Until the mortgages are foreclosed, or he has in some way surrendered his equity of redemption, he is entitled to the possession of the property, and, as the code provides, it cannot be appropriated or sold to satisfy the lien, "except in pursuance of a judgment of a court of competent jurisdiction ordering such sale." (Gen. Stat. 1897, ch. 95, § 395 ; Gen. Stat. 1899, § 4663.)

The findings of the jury being inconsistent with each other and with the general verdict, it follows that the judgment must be reversed and the cause remanded for further proceedings.