No. 25,739.

VANDY G. KOLAR et al., *Appellees*, v. LEVI ECKHARDT, *Appellant.*

SYLLABUS BY THE COURT.

1. MORTGAGES—*Absolute Deed as Mortgage — Pleading — Evidence.* Against defendant's motion for judgment on the pleadings and evidence, plaintiffs' petition and evidence were sufficient to state and prove a cause of action to have a deed purporting to convey their ranch to defendant judicially declared to be a mortgage, with plaintiffs' right to an accounting, and their right to redeem the property and to have the deed canceled.

2. PLEADING—*Amendment—Discretion of Court During Trial.* Rule followed that no error can be predicated on the allowance of an amendment to a petition at the close of the evidence where the record contains no showing that the trial court abused its discretion.

3. MORTGAGES—*Absolute Deed as Mortgage—Existence of Debt to be Secured.* The relation of debtor and creditor may be created by a contract between two parties, although no debt actually exists at the time the contract is made, where the parties intend that such relation shall thereafter arise by the advancement or payment of money by the one party in behalf of the other party, and where that arrangement between the parties is actually carried into effect pursuant to their contract.

4. SAME—*Redemption—Implied Obligation to Reimburse.* Where plaintiffs conveyed their ranch to defendant to secure him for whatever debts of plaintiffs he should satisfy, the law implied an obligation on the part of plaintiffs to reimburse defendant and redeem their property within a reasonable time after defendant had performed his part of the contract.

5. SAME—*Generally.* Various other matters of evidence considered; no trial error disclosed; judgment affirmed.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed November 7, 1925. Affirmed.

*S. C. Bloss* and *J. A. McDermott,* both of Winfield, for the appellant.

*Albert Faulconer, Kirk W. Dale, C. L. Swartz, W. L. Cunningham* and *D. Arthur Walker,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs, Vandy G. Kolar and wife, brought this action to have a deed to a ranch in Cowley county declared to be a mortgage to secure whatever sums might be advanced by the defendant grantee to pay liens on the land. They also sued for an accounting and to be permitted to redeem the land by pay-

1. Mortgages, 27 Cyc. pp. 1025, 1030. 2. Appeal and Error, 4 C. J. § 2757.
3. Mortgages, 27 Cyc. p. 1008; L. R. A. 1916B, 18 *et seq.;* 19 R. C. L. 271, 272.
4. Id., 27 Cyc. p. 1010. 5. Appeal and Error, 4 C. J. § 3122.

ing whatever such accounting might show to be due from them to defendant, and to have the deed canceled.

Briefly, the facts pleaded by plaintiffs, and which their evidence tended to prove, were to this effect:

In 1922 plaintiffs were the owners of 1,364 acres of Cowley county land, worth $30 to $40 per acre, incumbered to the extent of some $26,000 by mortgages. Defendant owned an adjoining ranch of 3,154 acres, and a quarter section of land in Oklahoma. He resided in Wisconsin, but visited his Cowley county property occasionally, at which times he usually paid plaintiffs a friendly call and sometimes stayed with them as their guest. In November, 1922, defendant came to Cowley county carrying with him a deed to his Oklahoma land, signed in blank by his wife. He went to Winfield and gathered some information from the county records concerning the extent of plaintiffs' indebtedness and then paid them a visit of a few days. In conversation with plaintiff's wife, Mrs. Kolar, he introduced the subject of their financial problems and displayed a knowledge of them which surprised Mrs. Kolar. He expressed a fear that one of their creditors named Denton would get their property away from them. Mrs. Kolar testified:

"He asked me how Vandy was getting along with his loan. I wondered how he knew at the time that Vandy was trying to get a loan; he knew about it and we had said nothing to him about it. . . . I told him we had arranged for a loan with Mr. Denton, but was unable to get the money as Mr. Denton had agreed, and had tried to get it elsewhere. I explained the situation, in a way. I didn't go into details. He says, 'Mrs. Kolar, we never can allow this; we will have to save the place for Vandy. We will have to arrange some way to do it. I will study it up and let you know.'"

Shortly after this conversation, at the suggestion of defendant, the Kolars agreed that the ranch should be deeded to defendant and that defendant's quarter section in Oklahoma should be deeded to Mrs. Kolar, so that a loan might be obtained upon that land to pay off some of the most pressing liens against the Kolar ranch. Defendant assured the Kolars he did not want their land, but would do this to help save it from Denton, and that he would give them a contract reciting the nature of their agreement and the purpose of these conveyances. Plaintiffs suggested that they should go to Winfield and consult a lawyer. Defendant objected to that suggestion and induced them to go to an abstracter or scrivener named Stafford. Defendant said, "We don't need an attorney. Mr. Stafford knows all about these things. He can handle it for us as well

as an attorney and less expense." It was partly through the services of this Mr. Stafford that defendant had informed himself of the status of the Kolars' indebtedness on his arrival from Wisconsin and before he had expressed to plaintiffs his solicitude and concern about their financial embarrassments. When Kolar and wife executed the deed to their ranch in defendant's favor, late in the after-noon of November 27, 1922, he left it with Stafford with instructions to have it recorded early next morning, and started to leave Stafford's office, when Kolar inquired of defendant when their contract would be prepared. Defendant replied, "It is late, Vandy; there is plenty of time for that; we will see to that later." At various later times he put off the preparation and execution of the written contract which was to evidence the agreement of the parties. Shortly after November 27 defendant and the Kolars went to Muskogee, Okla., and applied for a loan on the Oklahoma quarter section. The Kolars had never seen that property and knew nothing of its value, and defendant supplied the loan company with the requisite information concerning it, and the Kolars signed the application. Defendant told the loan company's official the Kolars were seeking to borrow the money to pay it to him. This loan was refused, as were one or more applications made elsewhere, apparently for the reason that the land was insufficient in value to secure the sum which the parties wished to borrow. At the time of these transactions defendant did not deliver the deed to the Oklahoma land to plaintiffs, but mailed it to them from Wisconsin about the time this lawsuit was foreshadowed. In January, 1923, plaintiffs notified defendant that they were ready to reimburse him for any sums he had paid out in their behalf and demanded a reconveyance of their ranch.

Much correspondence passed between the parties after the conveyance of the Kolar ranch to defendant in November, 1922, in which defendant continued to avow his disinterested zeal in plaintiffs' behalf, and narrated his efforts and plans and failures to raise money to pay off plaintiffs' most pressing debts. Significant extracts from some of defendant's letters to plaintiffs read:

"December 19, 1922.

"Will assure you, however, any amount due me in our settlement will be taken care of the same as though you had a federal loan. It will therefore affect us only in the ready cash we need so badly. . . . Will do anything I can safely do and assist in any way possible."

Kolar v. Eckhardt.

"December 21, 1922.

"I thought if we could get a loan on that farm it would be best for me to get it before recording it to you, then insert the loan in the deed and record it in your names as deeded subject to a loan, or if I can get enough money here, will let you have it and take mortgage myself."

"December 29, 1922.

"I hope to be able to swing this ranch deal and am still willing to do anything I can to help you, but I must be safe myself and cannot do much of anything on a moment's notice, so if you can arrange a plan that can save you and at the same time be safe myself, better let me know at once, for if your father cannot help you I do not know who will if I cannot.

"We should get this matter off our hands and our contract drawn so as to know about this also, but we cannot make a contract, Vandy, with this matter hanging over us."

"January 4, 1923.

"Since you are both interested in our business transactions, I feel it proper to address you both in business matters. Will say in the start that I am still endeavoring to raise the cash for Denton and others, but so far have failed, but not entirely discouraged."

"January 5, 1923.

"I do not hear from you folks as fully as I would like, but am sure you both realize that I and my interest are first in this matter, and am ready to strain every nerve to help you come through clear, except between ourselves which am sure you are willing to protect me in. . . . The deed [to the Oklahoma farm] is here, as I have previously written, and I feel since it is that it is best here until the matter is adjusted to the satisfaction of both parties."

"January 8, 1923.

"I sincerely hope you do not think I am trying to beat you folks out of the place there but I wrote you some time ago that I might be able to get a loan on the farm to a better advantage than you since the other application failed so flatly.

"Am sure you have done as well as you can and am doing all I can for you, and am expecting to continue to see you through if you will allow me. I want to save you from the place you have thoughtlessly gotten into. . . . My object is to protect you as well as myself, and for the things I do I expect you to protect me as far as you are able. . . . I have your welfare in mind I believe more than you have for yourselves and I want you to feel so."

"January 15, 1923.

"I have strained my own credit to help you. . . . The amount due me on our settlement for cash furnished in this deal and other items is on November 27th ($2,403.66) twenty-four hundred three 66/100 dollars. This is principally cash paid for you, that I need for myself with balance assumed; then I have obligated myself to raise the cash to pay off these past due mortgages on the land, for which we were to use the loan on the Oklahoma farm."

Meantime, while such correspondence as that above was passing between the parties, defendant succeeded in leasing his own ranch

of 3,154 acres and the Kolar ranch of 1,364 acres for oil and gas development for the usual royalties and $15,000 in cash, which he kept to his own use. About the same time he executed and tendered to Mrs. Kolar a writing obligating himself to give the Kolars one-half of whatever profits he might receive from one-eighth royalty of any oil produced from the Kolar ranch until they should receive a total of $13,640, upon condition that such obligation was to be kept private and unassignable. Mrs. Kolar was mystified by this offer and declined it. Sometime in January, 1923, defendant also prepared and sought to have plaintiffs sign an instrument which among other matters would have constituted a release of all their interest in the Kolar ranch. He repeatedly denied having prepared such instrument, but when confronted with the document he acknowledged it. The record reads:

"Did you ever ask them to release to you all their claim in that place after that time? No, sir. Never did? No, sir. Do you remember preparing for them a written document to be signed by them releasing all their interest in that Kolar Ranch? No. Never did? Do you remember of sending them a document prepared by you and in your own handwriting to be signed by them in which you asked them—it says, 'We also hereby release any and all claims upon the above land,' describing the Kolar ranch? No. Never sent them anything of the kind? No. . . . I hand you exhibit 19 [the instrument under discussion]. Is that your handwriting? I would consider it was. Would you say it is in your handwriting? I think so. Can I read it? Certainly. Yes, I drew that, I guess. That was dated January, 1923? Dated—down here at the bottom some place? —— day of January, 1923. Written up by you? Yes, sir. That was sent to them to be signed by them? I suppose so. And in your handwriting? Yes, sir. In that you say, 'We also hereby release any and all claims upon the above land.' You wanted them to sign that, didn't you? I guess I did."

On January 20, 1923, defendant announced that he had decided to retain the Kolar lands as his own. He wrote:

"In consideration of the forces and influences brought to bear upon me by which I was prompted to accept this deal, together with the time, expense and worry connected with it before and since, I have decided to hold it in connection with the other place, especially with the light I now have on this and other features of the transaction."

Against this formidable showing for plaintiffs, there was the evidence in defendant's behalf inherent in the deeds themselves, and in some correspondence of the plaintiffs, particularly that of Mrs. Kolar, the text and tone of which indicated her hope that defendant would reconvey or resell the ranch to them rather than reflecting the point of view of a writer who relied upon an unqualified and abso-

lute right to redeem the property by reimbursement to Eckhardt of whatever sums he had expended in their behalf. In defendant's behalf, also, there was the testimony of a neighbor who said Kolar told him he had sold out to Eckhardt, that he preferred to make a deed to Eckhardt rather than let the money loaners get hold of the ranch. There was also the evidence inherent in the circumstance that the insurance policies were changed so as to protect the interests of Eckhardt as owner; and there was also the evidence involved in the fact that Kolar had rented a tract of farming land elsewhere and had made some preparations to leave the ranch. Eckhardt swore positively that the transaction between himself and the Kolars was that of an ordinary exchange of properties; that he took over the Kolar ranch subject to its incumbrances and gave them in exchange his Oklahoma quarter section at a valuation of $10,000. Eckhardt also attempted, with dubious plausibility, to explain that the matters referred to in his correspondence with the Kolars related to his concern about their personal obligations other than those relating to the ranch.

But it is needless to outline the evidence at greater length. The trial court found all the issues in favor of plaintiffs, the most important of which, in part, read:

"The court finds that the deed mentioned and referred to in plaintiffs' petition, whereby the plaintiffs conveyed to the defendant the title to the real estate described in said petition, and commonly known as the 'Kolar ranch,' was and is a mortgage, and was so intended by all of the parties thereto at the time it was made, for the purpose of securing to the defendant the repayment of sums then owing and to be advanced by the defendant and for the account of and the use and benefit of the plaintiffs."

The court also found that defendant had expended for the benefit of plaintiffs $7,775.72, and that they were entitled to credits for oil lease rentals collected by defendant $4,677.85; that plaintiffs owed defendant a balance of $3,097.87; that defendant had caused the deed from himself to plaintiffs to the Oklahoma land to be recorded, and found that plaintiffs had tendered a reconveyance. The court also found that the full sum due from plaintiffs to defendant to redeem the ranch had been paid into court. Judgment was entered for plaintiffs, quieting their title, and directing that plaintiffs' deed in the hands of the clerk reconveying the Oklahoma land to defendant should be delivered to him.

Defendant assigns error in overruling his motion for judgment on

the pleadings and evidence, in the findings and judgment for plaintiffs, in permitting a belated amendment to plaintiffs' petition, and in denying a new trial.

Touching the first of these, there was no objection to the sufficiency of plaintiffs' petition to state a cause of action, and certainly there was no want of evidence to support it. Defendant suggests that if the plaintiffs' petition and evidence proved anything at all it was the existence of an optional contract to reconvey. That view would necessarily presuppose the fact of a genuine bargain and sale of the Kolar ranch to defendant in the first instance, and the evidence which the trial court saw fit to believe was that there never was any such bargain and sale, so an optional contract of repurchase could not exist. The facts and circumstances pleaded and proved by plaintiffs disclosed with sufficient clarity and conclusiveness an altogether different purpose in deeding the ranch to defendant, and quite justified the trial court's denial of defendant's motion for judgment.

Defendant complains because plaintiffs were permitted to amend their petition at the conclusion of the evidence. The trial court has a wide discretion in dealing with such matters. (*Bank v. Badders,* 96 Kan. 533, 152 Pac. 651; *Croner v. Keefer,* 103 Kan. 204, 173 Pac. 282.) Here the amendment permitted was the interpolation of an allegation that plaintiffs were to pay defendant, with interest, within a reasonable time, whatever amount he should expend in their behalf. Certainly the trial court did not abuse its discretion in permitting that amendment, although a liberal construction of plaintiffs' petition might disclose that its substance was elsewhere included or fairly to be implied in the petition, and that the amendment was not vitally necessary.

Defendant argues quite plausibly that there was no debt due from plaintiffs to defendant, and consequently there could be no relationship of mortgagors and mortgagee existing between them. That argument is specious but sophistical. There was, indeed, no debt due Eckhardt from the Kolars at the time they made their deed to him on November 27, 1922, because Eckhardt had not then paid out anything in their behalf. But the deed was made to him on November 27, not to secure anything the Kolars already owed him or anything they obtained from him that day, but to secure what it was anticipated they would owe him later when he should

pay off the pressing obligations which threatened the loss of their ranch. The test rule that there is no equitable mortgage relationship existing between the grantors and grantees of a deed unless the status of debtor and creditor is involved therewith is perfectly sound (*Hoyt v. National Bank,* 115 Kan. 167, 222 Pac. 27), but certainly a deed of conveyance may have the attributes of an equitable mortgage if the parties intend that the relation of debtor and creditor shall be created between them as a pertinent incident thereto. For example, should I require a considerable but uncertain sum of money, and my banker should agree to furnish me whatever sum I might need on condition that I make him a deed to my house as security, and the deed were accordingly executed and delivered to him—surely that deed would be no more than an equitable mortgage? And yet there would be no debt due from me to him until later, when I would actually procure from him the money I had anticipated the need of. (27 Cyc. 1008.) Transactions of this sort are everyday occurrences in banking circles in this state, and while instruments so executed might more precisely be characterized as deeds of trust, as, indeed, they are in some jurisdictions (19 R. C. L. 271) in this state, the courts usually designate them as equitable mortgages. (*McDonald & Co. v. Kellogg, Trustee,* 30 Kan. 170, 2 Pac. 507; *Hubbard v. Cheney,* 76 Kan. 222, 225, 226, 91 Pac. 793; *Hilt v. Griffin,* 77 Kan. 783, 90 Pac. 808; *Bank v. Kackley,* 88 Kan. 70, 127 Pac. 539; *Hegwood v. Leeper,* 100 Kan. 379, 382, 164 Pac. 173; *Dyer v. Johnson,* 109 Kan. 338, 198 Pac. 944.)

In 27 Cyc. 1059 it is said:

"A mortgage may be given as security for an unliquidated claim, or for whatever sum may be due from the mortgagor to the mortgagee at a given time, or for all and every kind of indebtedness which may exist between the parties or be thereafter contracted, without any specification or limitation as to amount; and in such cases it may be enforced for whatever sum the holder of the mortgage may prove to be due and payable."

Defendant makes the most of the fact that plaintiffs' evidence contained nothing to indicate when the Kolars were to reimburse him for whatever amounts he should expend in clearing the ranch of the claims of Kolars' creditors or otherwise in their behalf. But if the Kolar ranch was in fact conveyed to defendant on November 27, 1922, as security, the deed was a mortgage from its inception and nothing other than foreclosure or a superseding contract be-

tween the parties could thereafter change its character; and the law would imply an obligation on the part of the Kolars to pay Eckhardt and redeem their property within a reasonable time after he had performed the obligations which he undertook in their behalf. (27 Cyc. 1009.) Moreover, defendant is in no position to criticize any technical defects or minor uncertainties in the terms of the equitable mortgage contract existing between himself and plaintiffs. It was through no fault of theirs that those terms were not reduced to writing. Defendant repeatedly put them off with the assurance, "We will see about that later." For several weeks after he received the deed he continued to avow his intention that their contractual relationship should be defined in a written contract. On December 29, 1922, he wrote, "We ought to get . . . our contract drawn so as to know about this also. . . ."

Defendant emphasizes the fact that insurance on the property was taken out in defendant's name with Kolar's assent, and that plaintiffs told neighbors that Eckhardt had bought their ranch. It would have been rather curious if plaintiffs had taken third parties into their confidence and had told them the exact character of their arrangement with Eckhardt. (*Bank v. Kackley*, supra.) These and similar incidents in this case, which superficially considered might be deemed to be potent evidence in defendant's behalf, are not unlike those urged against the judgment in *Dyer v. Johnson*, supra, where it was said:

"Of course when plaintiff talked with strangers he spoke of the defendant as the owner of the property; and of course when he desired to lease the land for gas and oil he sent the lease to her for signature. He would hardly be expected to explain to third parties the informal and trusted relationship which existed between them. All these circumstances were in evidence for what they were worth. At the trial defendant's counsel was at liberty to make the most of them in his argument; but they serve little purpose here. It would not avail even if he succeeded in raising doubt in our minds touching the correctness of the trial court's findings of fact. The making of those findings was the function of the trial court, not ours." (p. 343.)

It is argued that the Kolars did not agree to reimburse defendant for any moneys paid out by him, and that defendant could have enforced no obligation against them. That contention is untenable. Plaintiffs' obligation to reimburse him might have been enforced by judgment and foreclosure. (R. S. 60-3107; *LeComte v. Pennock*, 61 Kan. 330, 59 Pac. 641; *Stratton v. Rotrock*, 84 Kan. 198, 114 Pac. 234; *Dyer v. Johnson*, supra.)

Appellant also contends that plaintiffs' claim that their deed of November 27 was a mortgage is inconsistent with the conveyance from Eckhardt to them of the Oklahoma farm. Not necessarily. Since the trial court gave full credence to plaintiffs' evidence and discredited that of defendant, it is clear that the Oklahoma farm was deeded to Mrs. Kolar so that it might be mortgaged to raise the money needed to pay the most pressing liens against the Kolar ranch. Defendant declared to them he was nearly as hard up financially as they were, and the mortgaging of the Oklahoma land was a part of the professed or pretended plan devised by defendant to "save the place for Vandy." And so the making of the deed to Mrs. Kolar, and her applications for loans in which she represented her ownership, and also her correspondence with the Oklahoma tenant, followed in natural sequence—unless indeed a more sinister interpretation is given to the whole transaction, which would be to this effect: That from the time defendant obtained his wife's signature in blank to the Oklahoma land before he left Wisconsin, every move he afterwards made, every promise and assurance he afterwards gave, every obscurity and equivocation contained in his letters to the Kolars, his maneuvers to have the Kolars apply for the loan on the Oklahoma land as if it were their own property, his attempt to manufacture a belated and additional consideration for the conveyance of the ranch by tendering to Mrs. Kolar a fractional interest in possible profits of the oil and gas lease, and his endeavors to procure a quitclaim or assignment of their interest in the Kolar ranch long after the ranch had been deeded to him—that these and all defendant's doings from first to last were part and parcel of a deliberately planned scheme to dupe the plaintiffs and strip them of their property and convert it to his own use.

The record discloses no error of law and indicates no miscarriage of justice, and the judgment is affirmed.