GRIFFIN v. GRIFFIN.

4-5911 141 S. W. 2d 16

Opinion delivered June 3, 1940.

*James H. Nobles, Jr., Silas W. Rogers* and *J. R. Wilson,* for appellants.

*Marsh & Marsh,* for appellees.

SMITH, J. John W. Griffin had title, by inheritance from his father, to the 120 acres of land which is the subject-matter of this litigation. His wife died in 1888, and he departed this life in 1880. He was survived by five children, three sons and two daughters. The eldest of these was L. M., who is referred to by all the witnesses as Marvin. Upon the death of their father, Marvin became the head of the family. Only a small part of the land was then in cultivation, and most of the merchantable timber had been cut and removed from it. With the assistance of J. S. Frost, an uncle, who was a carpenter, Marvin built a 4-room house on the land, and invited his brothers and sisters to make it their home.

The children, in addition to Marvin, were Lizzie Mae, who married Cameron; Lillian, who married Paty, and H. B. and A. G., the other two sons of John W.

Since Lizzie Mae married she has had a home of her own, but she has never lived more than three miles from the land. H. B. never at any time lived on the land. A. G. and Lillian did, and went to school when schools were in session. A. G. found work, when he came of age, at a sawmill, and has not since lived with Marvin. Lillian continued to live with Marvin until 1913, when she married, and moved with her husband to the State of Washington, where she remained until 1931, when she returned to visit her brothers and sisters.

On January 2, 1905, Marvin's brothers and sisters executed to him a warranty deed conveying their interests in the land. The deed recited a consideration of $400 to the grantors cash in hand paid. It is admitted that nothing was paid for the deed. On July 27, 1938, H. B. and his sisters, Mrs. Cameron and Mrs. Paty, filed this suit to impress a trust upon the land, by virtue of an alleged parol agreement to the effect that Marvin should take and hold the title to the land for the use and benefit of himself and his brothers and sisters. A. G. did not join in this suit.

The principal testimony tending to establish a trust was given by the sisters, although the testimony of the brothers was corroborative of that of the sisters. Mrs. Cameron and Mrs. Paty testified very definitely that the deed was executed for the purpose of creating a trust for the joint benefit of all the children; that Marvin represented that he owed some debts, which he wished to pay by executing a mortgage on the land, and that he desired to enter from the Federal Government as a homestead a 40-acre tract of land which adjoined the 120-acre tract, and that he could not do this without moving upon the 40-acre tract unless he could make the showing that he owned the adjoining 120-acre tract. After receiving the deed, Marvin did homestead the 40-acre tract.

The testimony of Mrs. Cameron and Mrs. Paty is definite and positive that the deed was executed for the consideration and purposes above stated, and that at various times after the execution of the deed Marvin recognized the existence of a trust and promised at a future time to render an account of his trusteeship. A daughter of Mrs. Cameron testified that she had heard Marvin make this admission.

The case was dismissed as being without equity, and this appeal is from that decree.

Many of our cases are cited and reviewed for the reversal of this decree, but the one chiefly relied upon is that of *Armstrong* v. *Armstrong*, 181 Ark. 597, 27 S. W. 2d 88.

It is insisted that the Armstrong case is "on all fours" with the instant case and announces principles which require the reversal of the decree here appealed from. It was held in this Armstrong case that equity imposes a constructive trust in favor of persons entitled to a beneficial interest against one who secured title by an intentional false oral promise, as where he held title for a specific purpose, but retained and claimed the land as absolutely his own.

In the Armstrong case a trust was imposed upon land which had been conveyed by a deed absolute in form. But that case was materially different from the instant case, in respects which will be pointed out. There the ancestor had mortgaged the land, and foreclosure was threatened after his death. To enable the oldest son to refinance the loan and to manage the land for that purpose, the other children conveyed their interests to him. The opinion in that case recites that "All the appellees, his brothers and sisters, testified in support of the allegations made by them, and their testimony was corroborated by that of disinterested witnesses, among whom was the justice of the peace who drew the deed from appellees to Monroe and took their acknowledgements. According to all this testimony, the deed was made to Monroe as the elder brother, so that he might secure money to pay the indebtedness then existing, and to manage the land and pay whatever indebtedness he might thus incur out of the rents and profits, and that, when this purpose was accomplished, he and his brothers would be the owners of the land, share and share alike. To our mind, this evidence is clear, satisfactory, and convincing, and warranted the chancellor in the conclusion reached."

Here, there is no disinterested testimony tending to show that a trust was created. Appellants say that their two brothers stand as disinterested witnesses, for the reason that they are not parties to this appeal and are now claiming no interest in the land. Of their testimony more will be presently said. Of course, it is not essential that the proof to establish a trust be made by wit-

nesses who have no interest in the case, but the interest of a witness is a fact which must be taken into account in determining whether the testimony is clear, satisfactory and convincing. Unlike the Armstrong case, the ancestor here had given no mortgage, the land was unencumbered at the time of the ancestor's death, and his heirs took their respective shares unencumbered.

Marvin was already in possession of the land, and had been for several years. He built the house, which became the home of all the children except one, and they occupied it as such until they set up homes of their own. Marvin testified that he did not ask for this deed, and had nothing to do with its preparation; that his brother, A. G., said the heirs had decided to make him a deed to the place, as he had worked and improved it, and had taken care of the family, until they were able to take care of themselves, and they thought it was right to give him a deed to the property, but he was asked to pay the cost of the execution and acknowledgments to the deed, and this he did. He testified that he was also asked to furnish Mrs. Paty a home, and this he did until she married and moved to the State of Washington.

The notary who prepared the deed and took all the acknowledgments to it has long since been dead, and we cannot know whether he would corroborate or contradict Marvin's testimony. Frost, the uncle who assisted Marvin in building the house, and was, no doubt, familiar with the family's affairs, and may have advised with them, has long been dead, and we are deprived of the benefit of his knowledge of the transaction.

No one places the value of the land at the time of the execution of the deed to Marvin at a higher figure than $5 per acre, exclusive of the improvements which Marvin placed upon it. Only a small part of the farm was in cultivation, and it is certain, indeed, it is undisputed, that the income from the farm was not sufficient to support the family, and Marvin was required to secure other employment to supplement the family income. A. G. had moved away, and had found other employment.

Here, as has been said, the ancestor had not encumbered the property, and owed no debts, but neither did Marvin owe debts, according to his testimony, and he had not even given a crop mortgage. He did not execute a mortgage upon receiving the deed, nor did he do so for more than a year after its delivery, and the mortgage then executed was for the sum of $175, which was used in buying a team "to log" the merchantable timber remaining on the land. Marvin testified that when his sister Lizzie Mae married, he gave her $5, which was all the money he had, to prepare for the wedding. From time to time he enlarged the farm by clearing the land, and he has made various improvements on it, but even now its chief value is derived from the fact that oil is being produced in that vicinity and oil leases on the land have become valuable.

Mrs. Cameron and Mrs. Paty testified that from time to time, and at various times, they discussed the trust with Marvin, and he recognized its existence and promised that at a later time he would account to them for their interests in the land. When Mrs. Paty returned to this state in 1931, she reminded Marvin that the deed to him recited a consideration of $400, no part of which had been paid, and she demanded a settlement of the trust, and she testified that Marvin promised to make a settlement as soon as he was able to do so. Marvin testified that he told his sister that it was not intended that the $400 should ever be paid, but to avoid a fuss he would pay it when he was able to do so, but he never paid Mrs. Paty the $100, which was a fourth of the recited consideration.

Mrs. Paty returned to this state in 1938, at which time Marvin had sold various oil leases, and she demanded 20 acres of the land. Marvin agreed to deed his sister 20 acres of the land, but testified that he agreed to do so because she reminded him that she was not 18 years of age when the deed from her to him was made. Mrs. Paty spent the night before the day the deed was to be prepared with her sister, Mrs. Cameron, and when Marvin went to Mrs. Cameron's home to take

his sister to town to have the deed prepared, Mrs. Paty said they had him where they wanted him and that he would also have to deed Mrs. Cameron 20 acres of the land. Marvin then declined to make either of them a deed, and this suit was soon thereafter filed.

At the time this suit was filed 33½ years had elapsed since the deed to Marvin had been executed. In the Armtrong case only 14 years had elapsed between the date of the deed and the filing of the suit to have a trust declared, and in that case there appears to have been no loss of testimony to explain the transaction, and the existence of a trust was shown by disinterested witnesses.

Here, no disinterested witness gave testimony showing the existence of a trust, and we may not know what testimony has been lost through the 33½ years while the heirs remained quiescent.

They insist that they did not remain quiescent, and that Marvin did not repudiate the trust until shortly before the time when this suit was filed. They say that, in addition to the conversations had with him, there was also correspondence with him on the subject. All this testimony was denied by Marvin. Certain it is that if they ever received a letter from him acknowledging the existence of a trust, no letter was offered in evidence. All the alleged conversations admitting a trust occurred in the absence of any disinterested witness, and was corroborated only by the testimony of Mrs. Cameron's daughter. During the 33½ years of Marvin's undisputed possession of the land he made every use of it of which it was susceptible. He cleared and improved the land, and sold the merchantable timber on it. During this time he executed 14 different mortgages on the land, 4 of them being given while Mrs. Paty was living with Marvin. These were all recorded within a short time after they were given, and during 21 years of this time Mrs. Cameron was living within one-half mile of the land. Marvin also executed various oil leases, which were duly recorded and were never questioned.

In 1921 Marvin proposed to sell an oil lease, and an examination of his title was made. In that connection his brother, A. G., made an affidavit, in which he detailed the heirship, the acquisition of the land by the heirs of John W. Griffin, a son of Logan Griffin, with which last-named person the break in the recorded chain of title appeared. A. G. stated in this affidavit that Marvin was the sole owner of the land, and had been in the exclusive possession of it as such since January 2, 1905, the date of the deed to him (except the 40 acres to which he had obtained a patent from the Federal Government).

In view of this affidavit, A. G. could not very well join in this suit, and he did not do so. But H. B. did, and he was the plaintiff first named. He joined his sisters in the prayer that a trust be declared for his benefit as well as for theirs.

When Marvin's title was under examination another objection to it was made, this being that Grace, the wife of H. B., had not joined in the execution of the deed dated January 2, 1905. This error could have been cured by having Grace alone convey, but on September 16, 1920, H. B. and Grace, his wife, both joined in the execution of a warranty deed to Marvin, whereby they apparently conveyed to Marvin the entire tract of land. H. B. denied any recollection of executing this deed, but that the deed was executed was shown by the testimony of the notary public who took the acknowledgment, and when that showing was made a nonsuit was taken by H. B., and it is now insisted that he is a disinterested party, inasmuch as he now claims no interest in the land. If there was ever a trust, it then existed, and its existence cannot be reconciled with the execution of this deed. At that time the oil lease which Marvin proposed to execute was of but little value. It was only several years later when oil was produced nearer this land that the leases became more valuable.

The testimony above recited that Marvin promised Lizzie Mae to deed her 20 acres of the land does not suffice to establish a trust. It is only evidence that a trust

existed which the deed would have discharged as to her, but, for the reasons herein stated, we think the testimony is not decisive of that fact.

In the well considered case of *Davidson* v. *Edwards,* 168 Ark. 306, 270 S. W. 94, Justice Hart said that the misrepresentation which will create a trust must be made before or at the time the legal title is acquired by the promisor, so that if the deed of January 2, 1905, did not create a trust, the subsequent promise of Marvin to convey his sister 20 acres of the land did not create one.

Courts are reluctant—and should be—to impress trusts upon lands conveyed by deeds absolute in form, especially, where, as in this case, many years have intervened before that attempt is made, and will not do so in such case, or, for that matter, in any case, unless the testimony tending to establish the trust is clear, satisfactory and convincing, as was said to be necessary in the Armstrong case, *supra.* We have many cases to this effect, the latest being that of *Maloch* v. *Pryor, ante* p. 380, 139 S. W. 2d 51.

We conclude that the court below was correct in holding that the testimony in this case did not measure up to the standard required by law, and the decree must, therefore, be affirmed. It is so ordered.