299 P.2d 188

Arturo R. CARRILLO and Mercedes Carrillo, husband and wife, Rupert Carrillo and Rachel Carrillo, husband and wife, Ysela Carrillo Vacovsky and Lloyd Vacovsky, wife and husband, Eloise Carrillo Aegerter, Concha Knittle and Walter Knittle, wife and husband, and Elizardo Carrillo and Rachel Carrillo, Appellants,

v.

Elvira Carrillo TAYLOR and William H. Taylor, wife and husband, Leo Carrillo and Henrietta Carrillo, husband and wife, Appellees.

No. 6086.

Supreme Court of Arizona.
June 26, 1956.

Darrow & D'Antonio, Tucson, for appellants.

Carlos G. Robles and Odin B. Dodd, Tucson, for appellees.

UDALL, Justice.

The six brothers and sister, above named, joined as plaintiffs (now appellants) in bringing an equitable action, containing two counts, against their sister Elvira Carrillo Taylor and brother Leo Carrillo (defendants-appellees), seeking to impress a trust in plaintiffs' favor—both express and constructive—of a 9/16 interest in an undertaking business founded by their father, known as the Tucson Mortuary. This appeal is from a judgment of the trial court impliedly finding that the

plaintiffs had not proven a case. Hereafter the parties will either be referred to by their first names or as plaintiffs and defendants.

The case was tried to the court sitting with a jury. At the close of the trial certain interrogatories were submitted to the jury; all of its answers were unanimous and were completely favorable to plaintiffs' theory of the case; however, this being an equitable proceeding, the answers were only advisory and not binding upon the trial court. See, Rule 39(*l*), 1956 Rules of Civil Procedure. Ultimately the court elected to disregard these answers and without making any specific findings of its own—as none had been requested—entered judgment that plaintiffs take nothing by their complaint. Defendants' motion and the clerk's minutes refer to this as a "motion for judgment notwithstanding verdict" which, technically speaking, is an erroneous nomenclature.

The first question presented is in what light the evidence is to be considered on this appeal. The law is well settled in this jurisdiction that in an equity matter "While the court need not heed the advice of the jury, it must harken to it." Stukey v. Stephens, 37 Ariz. 514, 516, 295 P. 973, 974. The final decision being that of the court, all presumptions are in support of its judgment and the appellate court in testing its validity will consider the evidence in the light most favorable to the successful party. Kubby v. Hammond, 68 Ariz. 17, 198 P.2d 134. This court in the case of In re Guardianship of Sorrells, 58 Ariz. 25, 117 P.2d 96, held, in effect, that where a verdict is advisory, the finding made by the trial court, and not the answers given by the jury to interrogatories determines the judgment, and that it is the judgment of the trial court and not the answers of the jury which must be assumed to be correct.

The facts stated in such light are as follows:

Arturo Carrillo and Eloisa Carrillo, his wife, in the year 1917, as a community enterprise, established an undertaking business known as the Tucson Mortuary, on the premises owned by them, at 204 South Stone Avenue in Tucson. There they lived, carried on that business, and reared their eight children, i. e., the plaintiffs and defendants. The father, Arturo, was a licensed mortician. On February 20, 1931, he acknowledged and recorded a notice of intention to, on "the 3rd day of March, 1931, sell, assign, and deliver the business now conducted by him * * * including the whole of his stock in trade, to Arturo R. Carrillo (his son) * * *." Later, on the date specified, he alone executed and acknowledged and recorded a bill of sale of the "business" with all of the stock in trade.

On February 12, 1935, the son gave notice of his intention to sell the business to

Elvira Carrillo, his sister, and on March 8, 1935 gave her a bill of sale to same. This instrument specifies that the fixtures are included, also one Nash automobile used as a hearse.

The father died on January 9, 1937, and his entire estate, including his interest in the premises at 204 South Stone Avenue—all of the net appraised value of $755—was set aside in a summary probate, on April 5, 1937, to the widow Eloisa Carrillo. No reference is made in this probate proceeding to the mortuary business as such.

Notwithstanding the paper transactions, supra, there is substantial evidence (although the jury did not so find) that there was no change in the operation of the business, either real or apparent; that is the father, from 1931 until his death, with the aid of his family, ran the business as he pleased, spent the money as he pleased, and supported the family of ten with the income therefrom. The mortuary bank balance at the time of his death was a minus $16.74.

For a period of approximately thirty-four months from the death of the father until Leo took over, Elvira with the aid of the family operated the business without a licensed mortician. The revenue therefrom was used to support the family.

Defendant Leo, the youngest son, was sent off to a mortician's school, and on November 7, 1939 he obtained a morti-cian's license. At all times since then he has been in charge of and has successfully operated this growing business. When Leo took over, the bank balance of the mortuary was minus $28.30, and the equipment then on hand and which was there at the death of the father was: an embalmer's table brought from Mexico in 1914, one old safe, some old instruments, two candelabras not in use, one catapult and four chairs, together with the name and good will of the business.

On December 31, 1943 a partnership was formed, evidenced by written articles of partnership, executed by the mother, Eloisa, the daughter, Elvira, and the son, Leo, which were subsequently recorded. The mother contributed the real estate at a recited value of $15,000, being the premises at 204 South Stone Avenue, which was conveyed by a bargain and sale deed to Tucson Mortuary, a co-partnership; Elvira contributed the "business of undertaking under the firm name of Tucson Mortuary * * * and motor vehicles and equipment necessary to carry on said business * * * the value of which is approximately Fifteen Thousand Dollars * *"; Leo's contribution was not monetary but only that he "* * * is a licensed embalmer and funeral director of the State of Arizona, and has been engaged in the business of undertaking, embalming and funeral directing for several years, * *". The partnership agreement expressly pro-

vided that "The death or retirement of any partner shall not dissolve the partnership as to the other partners * * *" and the exclusive right was granted therein to the survivor or survivors to purchase the share or interest of the deceased partner at book value.

Eloisa, the mother, died on March 17, 1951. Her estate was probated, Leo acting as administrator. With the sanction of the probate court, and as provided in the partnership agreement, the interest of the mother was sold to Leo and Elvira, as the surviving partners, and the cash proceeds amounting to $19,213.77, together with the residue of the estate, was distributed on December 22, 1952 to the eight children in equal shares of $2,575.81. No appeal was taken from the decree of distribution and it has long since become final, nor have the plaintiffs returned or offered to return what they received from the sale in probate.

With reference to the alleged trusts, plaintiffs kept shifting their position during the trial so that the lower court experienced difficulty, as have we, in determining precisely plaintiffs' theory as to just when the trust originated, who created it and who the settlor was. To begin with it seems to have been their position—as set forth in the first count of the complaint—that the father, Arturo, by parol created an express trust in 1931 by transferring the "business" and all personalty in connection therewith to the son, Arturo R., as trustee for the benefit of the mother during her lifetime and the balance to the children on her death; and in the second count an attempt is made to have the court declare the real property to be a natural increment to the trust res, upon the theory that the income from the trust res was used by Elvira to purchase the real property. The prayer is that plaintiffs be decreed to be the equitable owners and entitled to an undivided 9/16ths of both the real and personal property comprising the "Tucson Mortuary", and for an accounting.

The defendants, in their first amended answer, defended on the grounds, among other things, that: No trust was ever intended; no trust was ever created; that the ancestor had no property of any substantial consequence which he could convey in trust; that he retained the equitable interest in and control of all of his property until his death; that the instruments were intended to delay his creditors; that the transactions were within the statute of frauds; that all of the property was community property and that the wife did not join in the supposed trust; that the property of the ancestor was consumed by his family; there was nothing out of which to create a trust; and that the action was barred by limitations; that the decree of distribution in the mother's estate was res judicata as to the rights of plaintiffs; and that plaintiffs had not offered to do equity.

At the trial, upon inquiry being made as to how they arrived at the fraction %16ths, counsel at first conceded that one-half went outright to Leo and it was the half belonging to Elvira they were seeking to impress a trust upon. Nevertheless, during their case in chief the plaintiffs unsuccessfully sought leave to amend their complaint by adding a third cause of action to establish a constructive trust on all of said property because Leo, as administrator, sold their mother's interest in the partnership property to himself and Elvira and by reason thereof it was then urged that the plaintiffs were entitled to %ths of all of said property, both real and personal. This motion to amend was denied.

It appears from the record that on the fourth day of the trial the court required plaintiffs to elect when and on what date the alleged trusts were established. Counsel then announced (1) that he stood upon an express trust created by Arturo R. (the brother) when on March 8, 1935 he conveyed by a bill of sale the personal property in trust to his sister Elvira, which assertedly terminated upon the death of Eloisa (the mother); and (2) that a constructive trust as a matter of law came into being when on November 17, 1952, Leo, as administrator, conveyed, pursuant to an order of the Superior Court, the real property in question to himself and Elvira. · The plaintiffs (appellants) have set forth six assignments of error with a similar number of supporting propositions of law. However, in reality but four questions are raised, viz.: (1) a contention that in reviewing the judgment in the instant case the facts must be taken in a light most favorable to sustaining the answers given by the jury to the interrogatories rather than to sustaining the judgment of the court (as we have heretofore pointed out there is no merit to this contention); (2) that the exclusion of certain proffered testimony relative to the alleged inter vivos trust, as violative of the "dead man's statute" was erroneous; (3) that the exclusion of certain testimony on the basis of the "parol evidence rule" was also erroneous; and (4) whether the trial court erred in failing to impress a constructive trust upon real and personal property on behalf of the plaintiffs because of Leo's alleged sale in probate of said property to himself—regardless of the fairness of the sale or the amount paid therefor. The remaining questions will be considered in such order as seems best.

### Constructive trust

As heretofore pointed out, plaintiffs have shifted from their original claim of an express trust of the realty as set forth in the second count of the complaint and are now relying upon a constructive trust of all the real and personal property of decedent Eloisa purportedly created by operation of law. In the first place there is no pleading to support such a claim as it

will be recalled the trial court refused to permit an amendment to include the addition of a third count predicated upon such a theory, and this ruling has not been assigned as error.

Furthermore, plaintiffs are relying upon the establishment of a constructive trust as a matter of law solely because Leo, the partner, was the administrator of his mother's estate, and sold the entire partnership assets to himself and Elvira, and therefore, all of his acts, they assert, were void. No bad faith was ever claimed and there was no allegation of fraud. The conduct of Leo was open and aboveboard and as administrator his acts were thoroughly gone into, yet the only claim of anything wrong with the probate is that Leo was the administrator contrary to section 14–417 (E), A.R.S. 1956.

■ Conceding that Leo was not entitled to be appointed administrator in the face of the statute last named, it does not follow that the acts of such administrator are invalid, even though the order of appointment might have been voided in a direct proceeding timely instituted for that purpose. The essential basis of jurisdiction nevertheless existed and the appointment of the wrong person was but an irregularity not invalidating acts done by such officer in pursuance of the law in the course of administration. Lincoln Trust Co. of New York v. Gaddis & Perry Co.,

15 Ariz. 372, 139 P. 461, Ann.Cas.1915D, 1091; 21 Am.Jur., Executors and Administrators, section 112. Cf. Stapley v. Stapley, 29 Ariz. 487, 242 P. 1005. Obviously the present claim of invalidity cannot now be raised, as it constitutes a collateral attack upon a decree of distribution that has become final and which was ratified in open court by counsel for plaintiffs. Moreover, it should not be overlooked that under the contract of partnership the interest of the mother was expressly subject to purchase by the surviving partners, and they were liable to the estate of the mother for the value thereof as determined according to the partnership agreement. There is no contention that the estate did not get full value, or that plaintiffs did not get their share of that value. Pursuant to the partnership agreement the defendants could have forced a sale of the interest of the mother in the partnership, no matter who the administrator may have been. It is our view that the decree in the mother's estate is res judicata, and this coupled with the express ratification thereof by plaintiffs bars any question as to the regularity of the probate. Shattuck v. Shattuck, 67 Ariz. 122, 192 P.2d 229; In re Warren's Estate, 74 Ariz. 319, 248 P.2d 873, on rehearing 74 Ariz. 385, 249 P.2d 948. Cf. In re Schuster's Estate, 35 Ariz. 457, 281 P. 38.

■ By a supplemental brief plaintiffs place great reliance upon our recent deci-

sion in Honk v. Karlsson, 80 Ariz. 30, 292 P.2d 455. That case involved, in part, an effort to establish a constructive trust upon the theory of extrinsic or collateral fraud in preventing a fair submission of a controversy to the court. That decision has no application to the instant problem as here we have neither pleading nor evidence of any extrinsic fraud or mistake. On this record we hold that the trial court did not err in refusing to impress a constructive trust in favor of plaintiffs.

### Dead man's statute

Next, error is assigned as to the exclusion of testimony concerning statements of the father, Arturo Carrillo, to his son, Arturo R. Carrillo, on the basis of the so-called "dead man's statute", Section 12–2251, A.R.S. 1956, prohibiting certain parties from testifying in actions "by or against executors, administrators or guardians" and "actions by or against the heirs, devisees, legatees or legal representatives of a decedent arising out of any transaction with the decedent." The issue raised is whether the latter part of this statute applies to the instant situation. There is no question that if applicable the court's discretionary power was properly exercised, see Costello v. Gleeson, 15 Ariz. 280, 288, 138 P. 544; Murillo v. Hernandez, 79 Ariz. 1, 6, 281 P.2d 786.

Plaintiffs' argument is that in any event the estate of the decedent is not affected by a determination of this case for either party, therefore the statute has no applicability. They cite in support of this position our decision In re Welch's Estate, 60 Ariz. 215, 134 P.2d 701. That case dealt solely with probate matters, with which we here have no concern. Cf. Annotation Witnesses—Transactions with Decedent, 115 A.L.R. 1425.

■ The basis for exclusion expressly relied upon by the trial court was that "This action will affect the rights of the heirs." If this premise fails, his power of discretion as to disqualification of the witness never came into play, for no other possible statutory disqualifying interest existed. Prima facie it would appear that all the heirs of Arturo Carrillo are here parties to the suit as either plaintiffs or defendants. But it is clear their alleged interest in the case is solely as purported beneficiaries or trustee of an express inter vivos trust. Their right to recover in the instant case is not dependent on heirship. In the words of this statute, the disqualification applies only in actions "in which judgment may be given for or against them as such". We have held in construing this statute:

"Under these decisions interest in the issues of the suit does not disqualify as under the common-law rule. The person offered as a witness must be a party to a suit in which the judgment may be either for or against the

*heir*, devisee, legatee, or legal representative of the decedent *as such.* * * *" (Emphasis supplied.) Corbett v. Kingan, 19 Ariz. 134, 139, 166 P. 290, 292.

The lengthy study of the statute found in that case confirms the proposition that the general policy in Arizona is expressed in subsection B of Section 12–2201, A.R.S. 1956, to the effect that:

"A person shall not be incompetent to testify because he is a party to an action or proceeding or interested in the issue tried, * * *."

The "dead man's statute" is an exception to this general statement and is limited to cases specifically concerned with the disabling interests there enumerated.

 The salutary purpose of the statute is not to preclude all testimony of transactions with deceased persons, regardless of the controversy in which offered. It is, rather, to render incompetent as witnesses persons who will gain from inaccurate distortion of a transaction with decedent, where the interests in issue affect certain representatives of decedent in their capacity as such, and where death has rendered decedent incapable of giving the lie to the inaccuracies. Accepting the hypothesis, for the purpose of testing his competence, that this action is one to enforce an express trust, then the fact that fortuitously the parties are heirs as well as purported beneficiaries should not close the witness' mouth. Johnson v. Perkins, Tex.Civ.App., 140 S.W.2d 282; Reinschmidt v. Hirsch, 65 S.D. 498, 275 N.W. 356. Cf. 58 Am.Jur., Witnesses, Sec. 286.

 It has been held that where a suit involves a person in two capacities, only one of which is within the statute, if the joinder in the capacity within the statute is merely nominal or formal, testimony with decedent is not incompetent. Annotation Witnesses—Transaction—Deceased, 172 A.L.R. 714. A fortiori, where a suit is in no wise dependent upon a statutory capacity incidentally existing, such testimony is not incompetent. The purpose and intent of the statute is not to protect as between themselves mere inter vivos transferees of property received from decedent. We hold the trial court's ruling was erroneous.

### The parol evidence rule

Error is further assigned as to the exclusion of testimony by Arturo R. (the son) which purportedly would have tended to·show an express oral trust created by agreement between his father and himself, contemporaneous with the transfer of legal title by the bill of sale, and his subsequent conveyance of the bare legal title to his sister Elvira upon the same understanding. One of the grounds for exclusion recognized by the trial court was the parol evidence rule. The problem thus

raised is whether said rule prohibited any showing of an express trust in favor of certain alleged beneficiaries thereof as to the personalty conveyed by the bill of sale. This narrow question is one of first impression. We have held that an express trust in land modifying the terms of a conveyance absolute upon its face may not be shown by parol. Wright v. Young, 20 Ariz. 46, 176 P. 583. It is not clear on what basis this and concurring later cases were decided, see Rogers v. Greer, 70 Ariz. 264, 219 P.2d 760; it is suggested the basis of these decisions is something other than the parol evidence rule. Bogert, Trusts and Trustees, Vol. 1, Sections 51 and 64. We decline to re-examine those cases on this appeal, confining ourselves solely to the instant problem, which is distinguishable on the ground that only personalty is here involved.

 It is fundamental that the parol evidence rule is a doctrine of substantive law and not merely an exclusionary rule of evidence. 32 C.J.S., Evidence, § 851; In re Gaines' Estate, 15 Cal.2d 255, 100 P.2d 1055. Its purpose is to lend stability to integrated written expressions of intent in transactions by the process of excluding facts tending to vary, controvert or add to the expressed, unambiguous meaning of the parties thereto. Appellee argues that this question is foreclosed in Arizona by the case of Lee v. Standard Cement Pipe

Co., 55 Ariz. 463, 103 P.2d 457, wherein we held that the terms of a bill of sale may not be varied by parol. We do not retreat one step from that holding. The transfer by bill of sale herein is not challenged; rather, the grantee's legal title is confirmed, subject to the searching scrutiny of equity to ascertain for whose use or benefit this title shall be held. There is nothing in the bills of sale here involved which expressly fixes beneficial title in the transferee or negates a trust. Where the written instrument is silent, extrinsic evidence of a trust may be admitted. Restatement, Trusts, Sec. 38(3). See Scott on Trusts, Vol. 1, Sec. 38, pp. 226, 228. Cf. Wigmore on Evidence, 3rd Ed., Vol. IX, Sec. 2437; Farrell v. West, 57 Ariz. 332, 113 P.2d 866. Nor is such a ruling productive of uncertainty as to the efficacy of a writing; the weighty burden of proof to the equity court is still the establishment of beneficial title by *clear and convincing* evidence. Murillo v. Hernandez, 79 Ariz. 1, 9, 281 P.2d 786. We hold that the parol evidence rule had no applicability to the instant case, hence exclusion of the evidence in question upon that ground was improper. 89 C.J.S., Trusts, § 70; Hansen v. Bear Film Co., 28 Cal.2d 154, 168 P.2d 946, 959; In re Gaines' Estate, supra; Martin v. Martin, 43 Or. 119, 72 P. 639.

Having determined that the trial court erred in excluding certain testimony based on a claimed violation of the parol evidence

rule and the "dead man's" statute, does it necessarily follow that the judgment must be reversed and a new trial granted? We think not. Obviously the plaintiffs were not adversely affected with the jury by such exclusion, as its answers were nevertheless entirely favorable in finding that a trust had been established. Offers of proof were made, hence this court is fully advised as to what evidence would have been given had the defendants' objection thereto been overruled rather than sustained. The evidence excluded went primarily to the father's expressed intention to create a trust. Even had this evidence been admitted and accepted by the trial court the end result, as we see it, would as a matter of law necessarily have been the same. The basis for this conclusion will be manifest from what follows.

▉▉▉▉ Assuming that the settlor, Arturo Carrillo, had the power to convey in trust the mortuary business (i. e. the personalty) without joinder of his wife in the conveyance (which question we do not decide), still it is fundamental to the law of trusts that certain requirements must exist before an express trust will be recognized. Basically these elements include the following: (a) a competent settlor and a trustee, (b) a clear and unequivocal intent to create a trust, (c) an ascertainable trust res, and (d) sufficiently certain beneficiaries. 54 Am.Jur., Trusts, Sec. 30. Stilted formalities are unnecessary; never-theless each of the above named elements are required to be established, and if any one of them is missing it is fatal to the trust. Balian v. Balian's Market, 48 Cal. App.2d 150, 119 P.2d 426; In re Gaines' Estate, supra; Westcott v. Sharp, 256 Ala. 418, 54 So.2d 758; Griffin v. Griffin, 200 Ark. 794, 141 S.W.2d 16; Williams v. Anderson, 288 Ill.App. 149, 5 N.E.2d 593. Furthermore, as we have indicated, the burden of proving a parol trust must be met by clear and convincing evidence. Murillo v. Hernandez, supra.

No question is raised as to items (a) and (d), supra; with reference to item (b) it manifestly appears the purported settlor for six years subsequent to his alleged trust conveyance exercised full power, amounting to virtual ownership, over the business in question, which acts are wholly contradictory to the trust relationship. They at least cast grave doubts as to the sufficiency of the evidence to establish clearly and convincingly the intent to create an express trust. However we shall assume, arguendo, that the excluded evidence was legally sufficient to have supplied the missing link as to intent.

▉▉▉ This leaves for consideration item (c), the vital trust res. As to this, plaintiffs have wholly failed to prove any cogent connection whatever between the original purported trust res and the share of the thriving business to which they now lay claim. The "business" then consisted of a

license personal in its nature and by statute nontransferable; some trivial amount of equipment and stock in trade; and the name and good will of an individual proprietor of a personal service type concern, which herein is at best a wasting asset and of fleeting moment. Testimony by defendants indicated many outstanding bills due and nonexistent cash assets, at the time of transfer. The only refuting testimony is a bald statement by the son, Arturo, that the business was worth some $45,000 at the time he received it by bill of sale. This stands wholly unsupported and is contrary to all the other evidence. From 1931 to 1937 the father used as his own all the proceeds of the business and supported the family therefrom. After his death, until one by one the other children established homes of their own, the family continued to be supported from the business. Only after Leo received his license and began to run the business did the first indications of any real prosperity develop. Obviously any successes in the business were due to his skill and guidance and not to the insignificant infusion of the personal assets of the original firm. It would flaunt justice now to declare that a trust res so ephemeral has twenty-two years later produced the present prosperous concern. See, Mullin v. Mullin, 85 N.J.Eq. 531, 96 A. 996, for a remarkably similar case.

In ruling for the defendants the learned trial court correctly determined that with reference to the alleged trust plaintiffs had only spun a rope of sand—they had wholly failed to prove that any trust res was now ascertainable.

Judgment affirmed.

LA PRADE, C. J., and WINDES, PHELPS and STRUCKMEYER, JJ., concur.