61 So.2d 130

**PARRISH et ux. v. PARRISH.**

**5 Div. 527.**

Supreme Court of Alabama.

Oct. 23, 1952.

Omar L. Reynolds and Reynolds & Reynolds, Clanton, for appellants.

14

Jones & Macon, Wetumpka, and J. B. Atkinson, Clanton, for appellee.

LAWSON, Justice.

This is a bill in equity filed by Jim Parrish and his wife, Mrs. Pearl Parrish, against Dr. W. L. Parrish and seeks to have a deed which they executed to him declared to be a mortgage and that they be allowed to redeem the land in an exercise of the equity of redemption.

The trial court found that there was no mutual agreement expressed or implied that the deed should operate as a mortgage and, therefore, denied relief and dismissed the bill. This appeal is from that decree.

The suit property was purchased by Jim Parrish in September, 1929, for $3,650. It consists of ninety-five acres situated about three miles northeast of Clanton on the Lay Dam road. Approximately fifty-five acres of the tract is suited for cultivation. Jim Parrish, his wife, and two sons moved on the property in March of 1930.

On June 12, 1934, Jim Parrish and wife, Mrs. Pearl Parrish, executed two mortgages on the suit property. One was to the Federal Land Bank of New Orleans in the sum of $1,300. The other was to the Land Bank Commissioner, acting on behalf of the Federal Farm Mortgage Corporation, in the amount of $1,000. Jim Parrish got behind in his payments on the loans secured by the mortgages. Foreclosure notices were published in 1937. In the fall of that year he endeavored to sell some of the property in order to pay off the mortgage indebtedness. He tried to secure further loans. He was unsuccessful in both respects. Among those he approached relative to the purchase of a part of the tract was the respondent in this case, Dr W. L. Parrish, a veterinarian and a first cousin of Jim Parrish. After considering the proposal, Dr. Parrish declined to buy a part of the land.

In the spring of 1938 foreclosure was still imminent and again Jim Parrish approached his cousin, Dr. Parrish. As a result of negotiations between them, a warranty deed was executed on March 28, 1938, by Jim Parrish and wife, Pearl, conveying the entire tract of ninety-five acres to Dr. Parrish for a recited consideration of $300.

It is this deed which complainants seek to have declared to be a mortgage. Perhaps it is well to note at this time that the bill in this case was filed November 1, 1939. After demurrer was overruled, the respondent answered on April 17, 1941. The taking of testimony was not begun until around February 6, 1950, and the decree was rendered on August 24, 1951.

No money was actually delivered to the grantors. It seems that the sum expressed in the deed as the consideration therefor was the approximate amount needed to pay principal and interest then due on the mortgage indebtedness. On, to wit, April 6, 1938, Dr. Parrish gave his check in the sum of $310, made payable to Mr. and Mrs. Jim Parrish and the Federal Land Bank. It seems to be admitted that the proceeds of this check were paid on the debts secured by the mortgages.

There is a dispute in the evidence as to the agreement between Jim Parrish and Dr. Parrish and their conversation leading to the execution of the deed. But at the close of the taking of testimony an agreement was entered into, which in pertinent part reads as follows:

"It is stipulated and agreed by and between the parties and this stipulation to be used and considered as testimony in this cause along with all other testimony that at the time the conveyance in this case was executed Dr. W. L. Parrish had agreed to assume and pay and did assume the indebtedness of the Land Bank Commissioner loan and the Federal Land Bank mortgage already introduced in this cause, and has paid the Land Bank Commissioner mortgage, which mortgage was delivered to Dr. W. L. Parrish, upon payment of the same, by the Land Bank Commissioner and which mortgage has been introduced as evidence in this cause and said mortgage was never delivered to Jim Parrish. And that neither of said mortgages had been paid in full to the Federal Land Bank or to the Land Bank Commissioner before the suit in this cause was filed, and that Dr. Parrish did not receive possession of either of the two mortgages until after the suit was filed."

Jim Parrish was a man of fair education and business experience and his testimony, the language used and his grasp of the questions involved indicate that he was a man of considerable intelligence. As before shown, Dr. W. L. Parrish is a veterinarian and perhaps the better educated and more success-ful of the two men. They had been friends since childhood and are approximately the same age.

Jim Parrish testified that after Dr. Parrish refused to buy a part of the land he asked him for a loan of $300 to make the payments then due on his indebtedness secured by the two mortgages; that sometime later Dr. Parrish told him he had delivered a check in the sum of $300 to the agent of the Federal Land Bank in payment of the amount due and for him to go to an attorney and "make the papers"; that on the same day he and his wife went to the office of the attorney suggested by Dr. Parrish and there they both executed an instrument which he thought was a mortgage, although no note was executed; that he did not tell the attorney to prepare a mortgage, but did tell him to "prepare papers for Dr. Parrish to secure the $300."

Mrs. Pearl Parrish did not participate in the negotiations which led up to the execution of the deed. As to what transpired at the time the deed was executed, her testimony is to the effect that on entering the attorney's office her husband said, "We came to sign papers for Dr. Parrish"; that she thought it was a note; that after her husband had signed the instrument and left the room she read the instrument, at the request of the attorney, and stated to him that she was signing it voluntarily; that she thought the attorney had included a clause in the instrument giving the grantors a two-year period in which to redeem the property.

The respondent, Dr. W. L. Parrish, testified that Jim Parrish had sought to sell him a part of the property, but he had declined to purchase it; that thereafter Jim Parrish approached him and asked if he would be interested in purchasing the entire place by assuming the mortgage indebtedness and permitting Jim Parrish to remain on the property until the fall of 1938, when he could gather his crop; that he then told Jim Parrish to go to the attorney and have the deed prepared and that he would assume the mortgage indebtedness and permit Jim Parrish to remain on the property until the fall of 1938; that at the

time the deed was executed, at Jim Parrish's request, he agreed to reconvey the property to Jim Parrish if in the fall of 1938 the latter had repaid all that Dr. Parrish had expended by that time. This witness denied emphatically that in any of the negotiations leading up to the execution of the instrument he had agreed to make a loan in the sum of $300 or in any other amount.

The attorney who drew the deed testified on behalf of the respondent. A number of years had intervened since the deed was executed and the time his testimony was taken. But it was his recollection of the transaction that Jim Parrish and his wife came to his office and asked him to draw a deed conveying the suit property to Dr. Parrish; that no mention was made of a mortgage or that the grantors would have a right to redeem; that Jim Parrish stated in effect that since he was unable to make the payments due on his indebtedness and the mortgages securing that indebtedness were about to be foreclosed, he wanted Dr. Parrish to have the property by assuming the mortgage indebtedness, inasmuch as he did not think Dr. Parrish would cause him to move.

After the deed was executed, Jim Parrish and his family continued to live on and farm the suit property and paid no rent to Dr. Parrish. However, Dr. Parrish began the construction of a large barn, with the consent and approval of Jim Parrish.

In the fall of 1938 Jim Parrish approached Dr. Parrish relative to whether or not he would have to get off the property. Dr. Parrish informed him that he wanted to rent the property to his brother-in-law, Houston Jones, who was a good farmer. Jim Parrish agreed that the property be rented to Houston Jones, but testified that such agreement was based on his understanding that the rent which Jones was to pay was to go toward the payment of his debt to Dr. Parrish. In any event, Jim Parrish agreed to remove himself and family from the dwelling house in which he had been living and which was the best house on the place and to move in a smaller house. However, before this move was made the dwelling house in which Jim Parrish and his family were living was burned on, to wit, November 18, 1938. Jim Parrish and his wife then moved into the smaller house. A few days thereafter Dr. Parrish began the construction of a dwelling house in almost the same place where the house which burned had been situated.

Shortly after the construction of this house had begun, James Parrish, Jr., the son of the complainants, who was working in Birmingham, came to visit his family. He seems to have been perturbed about the fact that a new house was being constructed at the expense of Dr. Parrish. Within a few days he had a conversation with Dr. Parrish and paid him the sum of approximately $247, for which he was given a receipt. The payment made was in the exact amount which Dr. Parrish had just recently paid on one of the mortgages, and on the receipt Dr. Parrish wrote "For Fed. Land Bank on Jim Parrish place."

The testimony of James Parrish, Jr., and Dr. Parrish is in sharp conflict as to their conversation and the purpose for which the sum of approximately $247 was paid by the former to the latter. In effect James Parrish, Jr., testified that the money was paid on the amount which his father owed Dr. Parrish; that he asked Dr. Parrish for a statement as to the full amount owed, including improvements made; that later he was furnished with a statement showing that Dr. Parrish claimed approximately the sum of $3,200; that he told Dr. Parrish this was too much.

According to Dr. Parrish, in his conversation with James Parrish, Jr., he agreed to sell the property back to Jim Parrish for the amount which he had put into it and that the payment of approximately $247 was made to him on that basis; that shortly thereafter James Parrish, Jr., again talked to him in regard to the place, when his position was that although Dr. Parrish had a deed to the property and had expended a considerable sum of money in making improvements thereon, that he, James Parrish, Jr., wanted to control the use of the property, although he had only paid the sum of approximately $247; that he then advised

James Parrish, Jr., that if he and his father would get up the full amount Dr. Parrish had paid out on the property and pay it to him in a lump sum, he would convey the property to them. This was never done. Dr. Parrish retained the $247, although he has made efforts on several occasions to return it.

The house which burned was insured. The money received from the insurance company was paid on the mortgage indebtedness.

The new house was completed sometime prior to Christmas in 1938 and Houston Jones and his family moved onto the place and began farming operations. Jim Parrish and his wife continued to occupy the small farm on the property until a few months after this suit was filed which, as before indicated, was on, to wit, November 1, 1939. They paid no rent.

After the deed was executed in March, 1938, the suit property was continuously assessed in the name of Dr. Parrish. All notices in regard to payments due on the mortgage indebtedness were sent to Dr. Parrish.

There was considerable evidence introduced by both parties going to show the value of the property at the time the deed was executed. Although Jim Parrish bought the suit property in the fall of 1929, in the early days of the financial depression and before real estate values were materially affected, he paid therefor the sum of $3,650. By his own testimony, at the time the deed was executed the depression was in full swing. In any event, real estate values had not been restored. Although no improvements had been made on the property, he testified that in his opinion at the time the deed to Dr. Parrish was executed the suit property was worth the sum of $7,500. The testimony of other witnesses for complainants was to like effect. On the other hand, witnesses for the respondent estimated the reasonable market value of the property at the time the deed was executed as being from $2,300 to $3,000. The amount of indebtedness admittedly assumed by Dr. Parrish was $2,300. After careful consideration of the testimony as it relates to the value of the property at the time the deed was executed, we are convinced the value placed on the property by the testimony of witnesses for the respondent comes much nearer being correct. In any event, we are not impressed with the fact that the value of the property at the time the deed was executed was much in excess of the amount of the indebtedness assumed by Dr. Parrish.

The legal principles here applicable have been often stated and need not be repeated here at length. However, we will refer to some of them briefly.

An absolute deed will not lose its character as a conveyance by an agreement to allow the seller to repurchase at a future day for the same or an advanced price. West v. Hendrix, 28 Ala. 226; Martin v. Martin, 123 Ala. 191, 26 So. 525, and cases cited.

To be a mortgage, there must be a debt for which the grantee of the deed may maintain an action in assumpsit. Knaus v. Dreher, 84 Ala. 319, 4 So. 287; Smith v. Smith, 153 Ala. 504, 45 So. 168; Stollenwerck v. Marks & Gayle, 188 Ala. 587, 65 So. 1024.

The evidence to the effect that the deed was intended by both parties to be only operative as security for a debt must be clear, consistent and convincing. Knaus v. Dreher, supra; Rogers v. Burt, 157 Ala. 91, 47 So. 226; Richardson v. Curlee, 231 Ala. 418, 165 So. 223; Johnson v. Maness, 232 Ala. 411, 116 So. 452.

An agreement that another has the right to redeem the land indicates or is a circumstance showing that a mortgage exists, but not controlling when there is no debt. Vincent v. Walker, 86 Ala. 333, 5 So. 465; Fowler v. Haggins, 209 Ala. 176, 95 So. 816. When the controversy is whether the parties contemplated an unconditional sale or a mortgage, if the fact is denied, the seller must show by clear and convincing evidence that it was intended by both parties that it should operate as a mortgage. But when the controversy is whether it is a conditional sale, with reservation of the right to repurchase, or is a mortgage, the

court leans to the mortgage theory, Douglass v. Moody, 80 Ala. 61; Daniels v. Lowery, 92 Ala. 519, 8 So. 352; Turner v. Wilkinson, 72 Ala. 361, but cannot declare that it is a mortgage unless there was a continuing debt.

■■ The facts of the instant case are strikingly similar to those considered by this court in the case of Lindsey v. Hamlet, 235 Ala. 335, 179 So. 234, in which case we affirmed the action of the trial court in refusing to declare a deed a mortgage and in dismissing the bill. It is unusual to find two cases presenting such similarity of fact in so many material respects. However, this case does present two factual situations not presented in Lindsey v. Hamlet, supra. First, in Lindsey v. Hamlet, supra, it does not appear that there was any contention made that there was a great disparity between the value of the property and the consideration, while there is such a contention made in the instant case. However, we have heretofore indicated we are not impressed with the testimony adduced on behalf of the complainants on this point and we reiterate here that in our opinion the evidence does not show that at the time the deed was executed the value of the suit property was greatly in excess of the indebtedness assumed by the respondent, Dr. Parrish. The other factual difference is that in the instant case there is evidence to the effect that Dr. Parrish accepted a payment from James Parrish, Jr., on November 21, 1938, in the sum of approximately $247. But this fact alone is not, in our opinion, sufficient to warrant a finding that at the time this deed was executed all the parties thereto intended that it should operate as a mortgage. This is not a bill for specific performance and no such relief is sought.

The burden was on complainants to make out their case by clear, consistent and convincing evidence, with the presumptions leaning against them. We agree with the trial court that complainants have not done so. The decree is therefore affirmed.

Affirmed.

LIVINGSTON, C. J., and BROWN and STAKELY, JJ., concur.