367 P.2d 251

**Hubert MERRYWEATHER, Appellant,**

**v.**

**T. T. PENDLETON, J. B. Pendleton, James V. Robins, Baca Float Ranch, Inc., an Arizona corporation, et al., and Valley National Bank of Phoenix, a national banking association, Appellees.**

**No. 6572.**

Supreme Court of Arizona,

En Banc.

Dec. 7, 1961.

Nasib Karam, Nogales, and Herbert Mallamo, Phoenix, for appellant.

Darnell, Holesapple, McFall & Spaid, Tucson, for appellee T. T. Pendleton.

Gust, Rosenfeld, Divelbess & Robinette, Phoenix, for appellee Valley Nat. Bank of Phoenix.

UDALL, Justice.

Hubert Merryweather, plaintiff below and appellant here, brought an action to have an agreement with T. T. Pendleton, in the form of an absolute sale of certain shares of stock with an option to repurchase, declared to be an equitable mortgage or pledge. In the alternative the plaintiff contended that if the court should find the agreement was in fact a sale absolute it should also find (1) that plaintiff tendered payment under the option, (2) that defendant refused to accept payment and thereby waived performance under the terms of the sale agreement, and (3) that defendant T. T. Pendleton and the other defendants had by their acts converted plaintiff's stock.

The immediate transaction giving rise to this litigation was, in a sense, the culmination of a series of transactions involving the transfer of a block of 5,997 shares of stock in Baca Float Ranch, Inc. The shares, purchased by Merryweather from Baca Float Ranch, Inc. and T. T. Pendleton, its president, over a period of eight years, represent 50% of the total stock issued by the corporation. The initial purchase was completed February 19, 1949, Merryweather having paid therefor slightly in excess of $160,000.

Shortly after acquiring the stock plaintiff commenced an unbroken sequence of loans with pledges of the stock as security in each instance, which continued down to the transaction here in controversy.

The first loan was on October 13, 1949 from one Bell in the amount of $140,000. It was repaid and the stock redeemed on May 18, 1953 with the proceeds of a $160,000 loan from one Haggard executed the same day and also including a pledge of the redeemed stock. The second loan (from Haggard) was repaid by plaintiff on June 9, 1953 with the proceeds of a loan of $160,000 from T. T. Pendleton. Again the stock was pledged as security. This third loan was extended until July 17, 1954 when it was satisfied by the proceeds of another loan from Haggard for the increased amount of $180,000. Before the due date of the fourth loan (ultimately extended to January 25, 1955), plaintiff borrowed additional funds from Haggard which brought his indebtedness to the latter up to $220,000.

The transaction in dispute was the end result of plaintiff's negotiations with T. T.

Pendleton in an attempt to raise funds to satisfy the July 17, 1954 loan from Haggard and to prevent foreclosure on the pledged shares of stock. To accomplish this the parties executed on January 25, 1955 an agreement, Exhibit 4, which on its face provided for purchase of the stock by Pendleton for $200,000 and an option to repurchase by plaintiff within one year for the same sum plus 5% interest. On the same day and in a separate transaction the stock was pledged by Pendleton as security for a loan of $200,000 from defendant Valley National Bank the proceeds of which were used by Pendleton to pay plaintiff for the stock. The block of 5,997 shares was transferred from plaintiff to Pendleton on the books of the Baca Float Ranch, Inc.

Significantly, the bank also required Pendleton to pledge 2,797 shares of his own stock in the corporation to obtain the $200,-000 loan. In addition the bank required a "takeout" letter whereby one Thomas F. Griffin agreed to buy from the bank 5,000 of the shares at $42 per share at the request of either the bank or Pendleton if the latter were granted the loan and if he (Pendleton) retained ownership of the block of 5,997 shares for at least 14 months.

The court tried the case with an advisory jury which answered special interrogatories and also returned a general verdict, the latter in favor of plaintiff and supported by the answers to the interrogatories. Upon appropriate motion by defendants, however, the trial court substituted its own findings and set aside the verdict for plaintiff.

In its Order granting defendants' motion to set aside the findings and verdict of the jury and to enter judgment for defendants, the trial court said:

"An examination of the agreement nowhere reveals any obligation on the part of the plaintiff to pay the indebtedness in any event, and it goes without saying that to construe an instrument as a mortgage, which on its face is clear and unambiguous, evidence which is clear and convincing must be established to show that it was in fact a mortgage rather than a sale as it purports to be on its face. The plaintiff did not sign any promissory note, nor was any evidence adduced from which the court could construe a continuing obligation to pay the defendants any amount whatever. Plaintiff could exercise his option if he chose to do so, and if he did not he was not obliged to pay any amount to the defendant T. T. Pendleton.

\*     \*     \*     \*     \*     \*

"Without further quotation from the cases, the court feels that in addition to the cases heretofore discussed the following citations bear out defendants' position that an essential requisite to the setting aside of an instrument absolute in form in order to construe it

as a mortgage or pledge is that the obligation to pay the indebtedness must appear beyond question from the evidence [citations omitted]. * * * That element the court has found lacking in this case and therefore is obliged to grant the defendants' motion. * *"

In considering this appeal we are bound by the rule as stated in Carrillo v. Taylor, 81 Ariz. 14, 19, 299 P.2d 188, 191 (1956) that:

" * * * where a verdict is advisory, the finding made by the trial court, and not the answers given by the jury to interrogatories determines the judgment, and that it is the judgment of the trial court and not the answers of the jury which must be assumed to be correct."

See also Bohmfalk v. Vaughan, 89 Ariz. 33, 357 P.2d 617 (1960); Ariz.R.Civ.P. 39(l), 16 A.R.S.

At the outset we are met with plaintiff's assertion that the trial court erred in holding that the burden of proof was on the plaintiff to prove the instrument was other than what it purported to be by clear and convincing evidence. Plaintiff admits this to be the rule when one undertakes to prove that a sale absolute is in effect a mortgage but contends the case is otherwise when an option to repurchase is involved.

This argument that a lesser quantum of proof is necessary when attempting to show a mortgage was intended rather than a sale with option to repurchase was expressly rejected by the Supreme Court of Washington in Johnson v. National Bank of Commerce, 65 Wash. 261, 271, 118 P. 21, 23, L.R.A.1916B, 4 (1911). That court countered:

"We think the better rule is that, where there is a deed absolute in form either with or without a contemporaneous agreement for a resale of the property, there being nothing upon the face of the collateral papers to show a contrary intent, the presumption of law, independent of evidence, is that the transaction is what it appears to be, and that he who asserts that the writing should be given a different construction must show by clear and convincing evidence that a mortgage, and not a sale with the right to repurchase, was intended."

The court went on to hold that it had not been proved by clear and convincing evidence that the agreement in question was a mortgage.

That this rule obtains in Arizona see Sullivan v. Woods, 5 Ariz. 196, 200, 50 P. 113, 115 (1897), wherein it was held that "clear and certain and conclusive evidence" was required to show that a deed absolute and a separate option to repurchase together con-

stituted a mortgage. And in California proof "beyond all reasonable controversy that it was the intention of not only one but all of the parties that the deed should be a mortgage" is required of the proponent in this type of action. Wohle v. Price, 202 Cal. 394, 397, 260 P. 878, 879 (1927). See also Parks v. Mulledy, 49 Idaho 546, 290 P. 205, 79 A.L.R. 934 (1930).

■ Plaintiff next argues that the trial court was wrong in requiring that an obligation on plaintiff's part to pay an indebtedness "must appear beyond question from the evidence." It is important that this phrase from the trial court's order be read in connection with and in light of the preceding remark that there was not *"any evidence* adduced from which the court could construe a continuing obligation to pay the defendants any amount whatever." (Emphasis added.) When so read it is clear that the trial court required no more and no less than "clear and convincing evidence" to establish the debt.

■ The very essence of a mortgage is a subsisting obligation to pay. It matters not whether the debt existed before or was created by the transaction in question. But debt there must be. Charter Gas Engine Co. v. Entrekin, 30 Ariz. 341, 246 P. 1038 (1926). "It is not material that there should be any note or bond or other written evidence of debt, nor is it material that the indebtedness should have arisen in any

particular manner. It is only material that there should be a bona fide debt." I Jones, Mortgages, § 316 at 391 (8th ed. 1928). Here the instrument made it optional with plaintiff whether he should repurchase the stock. In such a case the trial court must look to the circumstances surrounding execution of that instrument for any evidence of mutual recognition of a continuing obligation to pay. None was found here. There is substantial evidence in the record to support the trial court's holding that the debt, which must be established by clear and convincing evidence, was not proved in this case.

Plaintiff assigns numerous other errors but most of these are subsumed under his main contention that the trial court erred in failing to find that Pendleton agreed to advance the money on a loan basis as in times past and only insisted that the agreement be in the form of Exhibit 4 to meet the requirements of the bank from which Pendleton was to borrow to pay plaintiff. Pendleton's rejoinder is that he refused to make the loan because he was unwilling further to involve himself in repeated loan transactions with one so continuously in financial straits and that the best he would do for plaintiff was to buy the stock and give the option to repurchase.

It is admitted by plaintiff that in August of 1954 he told T. T. Pendleton that he needed $200,000 to pay the indebtedness to Haggard, but in their discussions apparent-

ly Pendleton would loan him only the sum of $180,000. To confirm this understanding between the parties plaintiff wrote a letter to defendant Pendleton on August 20, 1954, which read in part as follows:

"In consideration of your agreement to loan to me the sum of $180,000 I hereby agree that I will not later than August 25, 1954, accept the loan of $180,000, and in consideration therefor execute to you a note for the principal sum of $180,000, bearing interest from August 18, 1954, at the rate of five per cent per annum until paid, payable on or before August 18, 1955; that I will deliver to you as security for said note 5997 shares of the capital stock of Baca Float Ranch, and will execute and deliver to you a pledge of said stock, said pledge to be in the form of the previous pledge agreement executed to you on the 9th day of June, 1953."

This loan however was never consummated because plaintiff needed $200,000, and more as time passed, to pay off his indebtedness. The exact language used in the discussions between the parties after August 20th is in dispute. The statement of Merryweather's attorney in his opening brief acknowledges this continuing conflict:

"We must confess that there is a sharp conflict in the evidence as to whether or not the subsequent discussions [the discussions that took place after the tentative agreement to loan $180,000 in August of 1954] between the Plaintiff and Defendant, T. T. Pendleton, related to a sale of stock with an option to repurchase or whether these discussions related to a loan."

The record further discloses that in a discussion which took place between the parties during the month of November 1954, Merryweather told T. T. Pendleton that his obligation to Haggard was the sum of $220,000. Pendleton's answer to Merryweather was:

"That's when I told him that $200,000.00 was my limit regardless of anything, and that I would never again get messed up in any loan, but that I would buy the stock outright and give him an option for a year to repurchase it."

On or about December 10, 1954, the parties had another meeting at which time Pendleton testified he reiterated his statement concerning "this purchase and repurchase thing", apparently referring to his purchase of the stock and the option extended to Merryweather to repurchase it. Further testimony on the part of Pendleton, which was in harmony with his position taken in November and December, reads as follows:

"Q. And what was that, again, that you told him on the 18th of January [1955]? A. I told him to remember that the only way I was going to touch this thing was to buy the stock out-

right and give him an option to repurchase it, because I may say that I had been to Mr. Patton and laid the foundation for this thing."

Pendleton testified further that in their meeting on January 24, 1955, the day before the execution of plaintiff's Exhibit 4, he represented the same stand to Merryweather. And to the question:

"Did you at any time between November, 1954, and the 25th of January, 1955 agree or offer to lend to Mr. Merryweather this amount of money?"

Pendleton replied:

"Never. I was careful about my language to him."

At the time of the signing of the agreement, T. T. Pendleton testified that "Merryweather read the agreement and indicated that it was the way he had understood it and that it was acceptable, and that's about it."

Present at the time of the signing of the agreement was Charles Patton, vice president of the Valley National Bank. Patton testified that he understood the agreement to be a bona fide sale, and that neither T. T. Pendleton nor Merryweather, nor anyone else, ever told him or in any manner indicated that the agreement (Exhibit 4) was not what it purported to be on its face.

Whether a transaction ostensibly a conditional sale is in fact an equitable mortgage or pledge depends ultimately upon the intent of the parties. Where, as in this case, the parties' testimony as to their intentions is wholly contradictory, such intentions must be determined from and in light of all the circumstances surrounding the transaction.

■ Plaintiff was in financial distress at the time of the transaction and the agreement called for sale of the stock for less than its market value as determined by the trial court.[1] Plaintiff argues that these factors, when coupled with evidence that the parties first contemplated a loan in their negotiations, establish an equitable mortgage or pledge as a matter of law. Disparity between consideration paid and the market value of the property involved is of course a factor tending to support an inference that a pledge was intended. But it is only one factor among many, and unless the disparity is gross the courts will not without more declare a transaction on its face a conditional sale to be a pledge. Youssoupoff v. Widener, 246 N.Y. 174, 158 N.E. 64 (1927). See also Rosenthal v. Le May, 72 So.2d 289, 292, 44 A.L.R.2d 336 (Fla.1954); Cousins v. Crawford, 258 Ala. 590, 63 So.2d 670 (1953); Chicago Savings and Loan Association v. Byrne, 24 Ill.App. 2d 560, 165 N.E.2d 337 (1960).

1. The trial court determined the value of the shares in the closely held corpora-

tion as of January 25, 1955 to be $393,-000.

It was also shown that plaintiff's indebtedness to Haggard in late 1954 had been increased from $180,000 to $220,000 thus making a loan from Pendleton for $180,000 insufficient to meet plaintiff's needs. Further, early in January of 1955 defendant Pendleton learned that the Baca Float Ranch, Inc. had been served with a writ of garnishment as result of plaintiff's indebtedness of $32,000 in another letter. A release or discharge of the writ was not secured by plaintiff until the day before the instant engagement was entered into. These illustrations of plaintiff's financial difficulties undoubtedly caused Pendleton serious concern respecting the wisdom of making a loan with the stock as security. They do not support an inference of overreaching by Pendleton; on the contrary they tend to substantiate his judgment in insisting upon a sale rather than a loan.

■ There is no evidence of fraud or overreaching here. The trial court considered all the evidence and concluded that the parties intended a sale, not a pledge. As that finding was made upon conflicting evidence and is supported by substantial evidence in the record this court will not disturb it on appeal. Kauzlarich v. Board of Trustees, Etc., 78 Ariz. 267, 278 P.2d 888 (1955).[2]

Plaintiff's alternative theory that under the option he had effected a valid tender the refusal of which constituted a waiver of performance and that defendants had therefore converted his stock is without merit. The record is devoid of any evidence that plaintiff ever made tender of the amount required under the option to T. T. Pendleton or his alleged agent, defendant bank. In Somerton State Bank v. Maxey, 22 Ariz. 365, 369, 370, 197 P. 892, 894, 14 A.L.R. 1117 (1921), this court quoted with approval the following:

> " 'Tender is an offer to perform a contract, or to pay money, coupled with a present ability to do the act * * *.' "

and:

> " 'a waiver is not operative if the other party has not the ability to produce the money presently.' "

The evidence is clear and plaintiff so testified that he did not have the money to make a tender the day prior to his alleged tender. On that day he inquired about an extension if he would pay $50,000,

2. In Rogers v. Greer, 70 Ariz. 264, 268, 219 P.2d 760, 762 (1950) it was noted that:
". "* * * there is no question that a conveyance intended, at the time of its execution, to be a security for the payment of money, will be considered a mortgage. However, there is a decided conflict in the evidence of this case as to whether the deed was given as a security for the loans, and according to the well-established rule, this court will uphold the judgment of the trial court if it is reasonably supported by the evidence."

less than one quarter of the required amount. Even that amount he said he proposed to borrow on security of the stock. The day of the alleged tender plaintiff went to the bank but he did not produce any money. Nor did he have a commitment from anyone to lend him the money. This was near the close of business on the last day on which the option could have been exercised.

■ Since the trial court correctly found that the bank was the agent of T. T. Pendleton for the collection of amounts if and when paid the latter under the option, Pendleton's absence from the bank on the day of the alleged tender was of no legal consequence.

■ The trial court correctly found that there was never any tender or attempt to perform accompanied by a refusal to accept which would excuse plaintiff from actual performance. His failure timely to exercise his rights under the option caused it to lapse, thereby foreclosing any right, title or interest he may have had in the stock.

The conscience of this court is ever sensitive to the plight of those taken advantage of by unscrupulous money lenders. Britz v. Kinsvater, 87 Ariz. 385, 351 P.2d 986 (1960); De Wulf v. Bissell, 83 Ariz. 68, 316 P.2d 492 (1957); Rogers v. Greer, 70 Ariz. 264, 219 P.2d 760 (1950); Farrell v. West, 57 Ariz. 332, 113 P.2d 866, modified on rehearing, 57 Ariz. 490, 114 P.2d 910 (1941); Coffin v. Green, 21 Ariz. 54, 185 P. 361 (1919). But this does not mean that we will either coddle parties to business transactions or unnecessarily burden commercial channels by protecting dealers in the market place from the consequences of their own poor judgment.

We have considered all other assignments of error and find them to be without merit.[3] The judgment of the trial court is therefore affirmed.

JENNINGS and LOCKWOOD, JJ., concurring.

STRUCKMEYER, Chief Justice (dissenting).

The evidentiary facts upon which the ultimate decision in this case rests are substantially without dispute. The cause being in equity, this Court is at liberty to draw its own conclusions from the undisputed

3. Defendant made certain cross-assignments of error which seem proper in this case since they tend "only to support or defend and uphold the judgment of the lower court * * *." Maricopa County v. Corporation Commission of Arizona, 79 Ariz. 307, 310, 289 P.2d 183, 185 (1955). However, because there is sufficient evidence to support the judgment of the trial court it is not necessary to consider any matters raised by such cross-assignments. Gillespie Land & Irrigation Co. v. Jones, 63 Ariz. 535, 164 P.2d 456 (1945).

facts. Sanders v. Brown, 73 Ariz. 116, 238 P.2d 941.

Baca Float Ranch, Inc. is an Arizona corporation, incorporated in November of 1932. It is the owner of approximately 52,400 acres of grazing land and 1,600 acres of agricultural land, all of which is improved with wells, tanks, fencing, feed mills, pens, ditches, underground pipelines and buildings and facilities suitable and capable of caring for 5,000 cattle. The jury found that Merryweather's stock at the time of its purported sale to Pendleton in 1955 was worth $630,000.

Merryweather first met Pendleton in 1939 at which time, seemingly, the two became close personal friends and thereafter business associates. In 1941 Merryweather first acquired a block of stock in the Baca Float Ranch and by February of 1949 owned 5,997 shares representing 50% of the total shares issued, paying a sum slightly in excess of $160,000. Pendleton was in charge of the ranch during which time Merryweather "always went along" with what he did.

In October of 1949 Merryweather commenced a series of transactions which cul-minated in the present dispute. He first borrowed $140,000 from one Thomas Graham Bell; thereafter, on May 18, 1952, he borrowed $160,000 from D. M. Haggard and Tobe Foster, using the proceeds to discharge the Bell obligation. On January 9th, 1953, appellant borrowed $160,000 from T. T. Pendleton which he used to pay off the Haggard-Foster obligation. In July of 1954, he borrowed $180,000 from D. M. Haggard (later increased) and used the proceeds to pay off the Pendleton obligation. In each of these transactions Merryweather pledged his 5,997 shares of stock in the Baca Float Ranch as security for the indebtedness.

Early in August of 1954, Merryweather and Pendleton began discussions with reference to paying off the Haggard obligation. The discussions culminated on January 25th, 1955, with the assignment of the stock in blank and transfer to Pendleton accompanied by a written collateral agreement that within one year Merryweather had the right to repurchase for the sum of $200,000 plus interest at the rate of five per cent (5%) per annum.[1] Merryweather's position is that the transaction, while ostensibly

1. The relevant part of the agreement.
    "The party of the second part, [Pendleton] in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration to him in hand paid by the party of the first part, [Merryweather] does hereby give and grant unto the party of the first part an exclusive right and option to repurchase said shares of stock at any time within one (1) year from date hereof. The purchase price of said stock, if said option is exercised shall be the sum of Two Hundred Thousand Dollars ($200,000), plus interest on said sum at the rate of five per cent (5%) per annum from the date thereof until the said option is exercised, which shall be payable in cash at the

a sale, was in substance a pledge of the Baca Float Ranch stock to secure a loan and neither more nor less than a transaction to secure the repayment thereof. A sale absolute on its face will be treated as a mortgage if the parties so intend. Britz v. Kinsvater, 87 Ariz. 385, 351 P.2d 986. In the instant case the repurchase agreement executed contemporaneous with the transfer prima facie evidences the intention of the parties.

In construing the repurchase agreement there must be adherence to the accepted rules uniformly prevailing to determine the meaning of instruments. The construction of a written contract is, of course, peculiarly a function of the Court. Ruby v. United Sugar Companies, S. A., 56 Ariz. 535, 109 P.2d 845; Rio Grande Oil Co. v. Pankey, 50 Ariz. 529, 73 P.2d 707; Sills v. Velvin, 49 Ariz. 553, 68 P.2d 338. Its legal effect is to be determined by its provisions and not by the labels which are appended thereto. Employer's Liability Assurance Corporation v. Heaton Lunt & Son, 82 Ariz. 320, 313 P.2d 393; Intermountain Building & Loan Ass'n v. Gallegos, [9th Circuit] 78 F.2d 972, certiorari denied, 296 U.S. 639, 56 S.Ct. 172, 80 L.Ed. 454. Courts are concerned with the practical operation of instruments and not with the descriptive words which may be applied to them. Arizona State Tax Comm. v. Garrett Corporation, 79 Ariz. 389, 291 P.2d 208.

Thus, it has been held that while the body of an instrument is called an option yet upon examination it becomes apparent that it is an instrument to reconvey upon contingencies, a court will so declare its true nature. Jeffries v. Charlton, 74 N.J.Eq. 430, 70 A. 145. Such is, of course, consistent with the universally applicable rule that equity looks to the substance rather than the form. Equity will go behind the form of a transaction to impose liability against evasion by a concealment of the instrument's true character. Kennedy v. Morrow, 77 Ariz. 152, 268 P.2d 326; Wallace v. First Nat. Bank, 39 Ariz. 451, 452, 7 P.2d 586.

The agreement gave Merryweather the right to have the stock returned to him upon payment of the $200,000 [the purchase price] plus five per cent (5%) interest. Were it collateral to a deed it would constitute an agreement of defeasance. Under such circumstances, that is, where the purported purchaser of property gives back to the purported seller a written agreement containing a right to have the property reconveyed, the transaction has been considered as one of security. Logsdon v. Quist, 102 Colo. 560, 81 P.2d 770; Exchange Trust Co. v. Godfrey, 128 Okl. 108, 261 P. 197; Wells

---

time of exercising said option. Should first party fail to exercise said option within one (1) year from date hereof, the same shall thereupon expire and be of no further force or effect."

v. Hilburn, 129 Tex. 11, 98 S.W.2d 177. In Logsdon v. Quist, supra, the agreement provided:

" 'It is therefore mutually agreed that the said The Star Loan Company will reconvey said real property to said Emma M. Logsdon, provided however, that all of the following terms and conditions are complied with, to wit: * * *.'" [102 Colo. 560, 81 P.2d 771.]

The Colorado Court stated:

" * * * That the company held it but conditionally is evidenced by the fact that upon the payment of certain money it was to be reconveyed to her. In legal effect the conveyance with the right to a reconveyance upon the payment of a certain amount of money constituted the transaction a mortgage."

Jones on Mortgages states the rule:

" * * * Any stipulation or agreement that plainly indicates an intention to return or reconvey the property, upon payment of the sum named, constitutes a mortgage. If there be in the deed itself, or in any separate deed executed at the same time, and constituting with the conveyance one transaction, a provision that the estate shall be reconveyed upon the payment of the debt, such stipulation constitutes a defeasance as much as if the words 'on condition,' or 'provided, however,' were used.

Thus, a reservation by a grantor of the privilege of redeeming within a specified time creates a mortgage, if the deed was given to secure a debt." 8th Ed., Vol. 1, Section 291.

The purchase agreement gave notice to the world that title could be defeated on the condition stated therein. On its face it has the indicia of a transaction of security.

The general rule is that an absolute deed will be held to be a mortgage where it conveys an estate subject to defeasance. It is a defeasance, express or implied which makes an instrument in the form of an absolute conveyance a mortgage, Owens v. State, 133 Okl. 183, 271 P. 938, for a mortgage is simply a deed containing a clause of defeasance. No particular form of defeasance is required, Gish v. Terrell, 266 Ky. 424, 99 S.W.2d 168. Provisions in instruments that the seller has the privilege of repurchasing have been construed as mortgages. Parrish v. Parrish, 258 Ala. 13, 61 So.2d 130; Bender v. Kaelin, 257 Ky. 783, 79 S.W.2d 250; Law v. Meadows, 131 W. Va. 132, 46 S.E.2d 449.

While on its face the instrument has all the earmarks of a transaction to secure a debt, in order to derive the intention of the parties, the true character of the transaction may be shown by parol. Warner v. Gosnell, 8 Ill.2d 24, 132 N.E.2d 526; Umpqua Forest Industries v. Neenah-Oregon Land Co., 188 Or. 605, 217 P.2d 219.

Plaintiff, Merryweather, joined the Valley National Bank of Phoenix, a national banking association, as a party to this action because the bank was in possession of the stock. The bank acquired possession when contemporaneous with the execution of the transfer of the stock certificates and the repurchase agreement it loaned to Pendleton the sum of $200,000 and accepted as part security the 5,997 shares of capital stock of the Baca Float Ranch previously held in Merryweather's name but reissued to Pendleton in the presence of Charles Patton, a vice president of the bank.

After Merryweather signed the stock certificates and executed the repurchase agreement, Pendleton executed a note for $200,000 payable to the bank. This was the amount of Merryweather's indebtedness to Haggard. Haggard was called and came over to the bank and accepted the $200,000. This was necessary because the stock had been pledged to secure the Haggard indebtedness. Pendleton's brother then brought over the corporate stockbook and seal and the stocks were reissued in Pendleton's name. Thus, the stocks which were in Merryweather's name until a few moments before became part of the collateral for the bank's loan to Pendleton.

It should be reiterated that Merryweather owed D. N. Haggard $200,000 on previous loans; that Pendleton made arrangements for repayment of the Haggard debt by borrowing $200,000 from the bank; that immediately after Merryweather signed over the stock it was reissued in Pendleton's name and accepted by the bank as collateral for the loan to Pendleton.

Under A.R.S. § 33-791—Foreclosure of Pledge of Chattels, as much of the pledged property as is necessary to pay the debt must be sold at public auction. So, if Pendleton defaulted only those shares necessary to satisfy the debt would have been sold. Whether they were Pendleton's original shares or shares transferred to Merryweather would, of course, be immaterial to Pendleton since all the shares were in his name. Hence, looking through the form of the transaction to its substance, since the shares were worth $630,000, it is plain that Merryweather's property was in reality the security for the debt.

Pendleton argues that this can not be a transaction to secure a debt for the reason that there was no debt in existence which Merryweather was required to pay. It is true that the existence of the debt is essential in order to have a transaction construed as one of security. Indeed, this is the distinguishing aspect which determines whether the parties are dealing as in the ordinary agreement of repurchase or as security for an indebtedness. Charter Gas Engine Co. v. Entriken, 30 Ariz. 341, 246 P. 1038. But the question of whether there was a debt is not to be solved by examining the evi-

dence to determine whether Merryweather gave Pendleton his personal promise to repay the $200,000.

It is at this point that I am in most serious disagreement with the majority. It is assumed because there was no specific promise to pay in such words as "I promise to pay" or their equivalent, that there was no debt. The very contrary is true. It is commonplace to find an agreement that a debt will be satisfied out of a particular fund or security. That an indebtedness nonetheless exists can not be doubted even though there is no further personal liability on the part of a debtor. It is the security that becomes liable for the extinguishment of the debt. Russell v. Southard, 12 How. 139, 13 L.Ed. 927; Hilpert v. Commissioner of Internal Revenue, 5 Cir., 151 F.2d 929, 162 A.L.R. 899; In re A. Roth Co., 7 Cir., 118 F.2d 156; Land O'Lakes Dairy Co. v. Wadena County, 229 Minn. 263, 39 N.W.2d 164; O'Briant v. Lee, 214 N.C. 723, 200 S.E. 865; Jones on Mortgages, 8th Ed., Vol. 1, Section 436.

In this case the security, the stock in the Baca Float Ranch, was valued at many times in excess of the obligation. The stock was more than ample to indemnify Pendleton against any possible loss and this was known to both of the parties to the transaction. No personal promise to pay was necessary because by transferring the stock to Pendleton payment of the obligation was guaranteed a year in advance of the maturity date. There was no need for Merryweather to assume a further personal liability and patentedly none was expected. Nonetheless, while there was no personal responsibility for the $200,000 beyond the security transferred to Pendleton, *the fact is unalterable that Merryweather's property secured the repayment of that sum to Pendleton.* As was stated in Russell v. Southard, 12 How. 139, 13 L.Ed. 927, supra:

"* * * It is not to be expected that the party would, by taking personal security effectually defeat his own attempt to avoid the appearance of a loan."

There is seemingly one conflict in the evidence. Defendants point to this as justification for affirming the trial court's findings. Pendleton argues that he offered to buy Merryweather's stock for $200,000, and that this created an outright sale. However, when he was closely pressed on cross-examination he was compelled to admit the reason why the transaction took the form of an absolute sale.

"Q. Now you have stated, Mr. Pendleton, that the reason why you wanted this sale, as you say, was to avoid that contingency that if at the end of a year's time if the money for repurchase was not paid to you you would avoid the unpleasantness of a foreclosure of Merryweather's stock. Is that correct?

* * * * * *

"A. That is partly correct.

"Q. In deciding the route that you would go in helping Hubert or in keeping others from getting interested in the Baca Float Corporation you decided that you did not want any agreement which would require you to foreclose Merryweather's stock? A. I will say that was partly the reason.

"Q. And what was the rest of the reason, sir? A. Well, it just seemed simpler to me than going through all this complicated foreclosing and trouble that had been going on here for four or five years.

"Q. Now, I take it that by going this route, of sale you knew that at the end of this year's time you would not have to put the stock up for sale and have a public or private auction of it. Is that what you were trying to avoid? A. Yes, that was one thing."

The only conclusion that can be drawn from Pendleton's testimony is that the transaction took the form of a sale because he, Pendleton, wanted to avoid the trouble of a foreclosure. This is the very reason for an intervention by a court of equity. Handrub v. Griffin, 127 Kan. 732, 275 P. 196; Wiswell v. Simmons, 77 Kan. 622, 95 P. 407; Worley v. Carter, 30 Okl. 642, 121 P. 669; Talley v. Eastland, 259 Ky. 241, 82 S.W.2d 368. The court in Handrub v. Griffin, supra, in reaching the conclusion

that the transaction did not constitute a sale stated:

"Where, at the same time a deed is made, the grantee executes a contract to reconvey upon the payment of an existing debt owing by the grantor, the transaction is in effect a mortgage, notwithstanding the grantee takes possession, and refuses to accept an ordinary mortgage, giving as a reason that he does not wish to be at the expense of a foreclosure in case of a default." [127 Kan. 732, 273 P. 200.]

Whether the transaction is called a loan or sale is simply a question of what word the witness chooses to use, whether it be the instrument or the man. Pendleton intended to make funds available to Merryweather to pay off the Haggard debt and as security for repayment thereof Merryweather's stock in the Baca Float Ranch was transferred to him. The form of the transaction was for the purpose of assuring that Pendleton was repaid the money, but without the trouble of a complicating foreclosure.

A.R.S. § 33–702 provides:

"Mortgage defined; pledge distinguished; admissibility of proof that transfer is a mortgage

"Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is a mortgage, except a transfer of personal property accom-

panied by an actual change of possession, which is deemed a pledge. The fact that a transfer was made subject to defeasance on a condition, may, for the purpose of showing that the transfer is a mortgage, be proved except against a subsequent purchaser or encumbrancer for value and without notice, notwithstanding that the fact does not appear by the terms of the instrument."

It is plain that the bank had notice of Merryweather's dominant interest in the stock. The transfer of stock and the signing of the repurchase agreement was as stated in the presence of Mr. Charles Patton, Vice President of the Valley National Bank, in charge of agriculture and livestock loans. He testified that discussions concerning the loan were had in his office prior to the actual consummation of the transaction. The execution of the repurchase agreement, together with the attendant circumstances were known to the bank— Merryweather's indebtedness to Haggard, the transfer of the stock in order to secure the loan to Pendleton by which Haggard was paid—all under the Statute, A.R.S. § 33–702, supra, could only lead an impartial observer to but one conclusion that while the transaction took the form of an outright sale it was in fact intended to be security for a loan.

A court is unsophisticated indeed to allow the protestations of interested parties after the fact to control the decision. The testimony establishes that Pendleton set up the form of the transaction only after numerous consultations with his attorney. The instruments of sale and repurchase were drawn by his then lawyer. The jury found that the stock at the time of the transaction was more than three times the value of its purported sale price. Merryweather asked the court to declare the transaction a pledge so that he might have the statutory period to redeem and if unable to do so then that it, or so much as necessary to satisfy the debt, be sold to the highest bidder pursuant to the law—first applying the proceeds to payment of the bank's debt. Anything less, in my opinion, is unconscionable.

This case was tried to a jury which returned a general verdict and thirteen (13) special findings, all favorable to Merryweather. These findings were thereafter set aside by the trial court which entered findings opposed to those of the jury and upon such findings entered a verdict in favor of appellees.

In its written order setting aside the findings and verdict of the jury, the trial court stated:

"* * * an essential requisition to the setting aside of an instrument absolute in form in order to construe it as a mortgage or pledge that the obligation to pay the indebtedness must appear *beyond question* from the evidence. * * * That element the court has

found lacking in this case and therefore is obliged to grant the defendant's motion to set aside the findings and verdict of the jury." (Emphasis supplied.)

In this the trial court palpably was in error.

The words "beyond question" are synonymous with "beyond a reasonable doubt". In re Meckley, 3 Cir., 137 F.2d 310. Proof beyond question or beyond a reasonable doubt is known only to the criminal law, it being the universal rule in civil actions that the party having the burden of an affirmative issue must establish his case by clear and convincing evidence. Jones v. Provident Mut. Life Ins. Co., 7 Cir., 109 F.2d 412; Cowles v. Zlaket, 167 Cal.App.2d 20, 334 P.2d 55; Investor's Mortgage Security Co. v. Hamilton, 51 Idaho 113, 4 P.2d 347; Child v. Child, 8 Utah 2d 261, 332 P.2d 981; Zivotosky v. Max, 190 Misc. 1044, 75 N.Y. S.2d 553. In some instances such language has been used as clear, cogent and convincing, Rincon Inv. Co. v. White, Tex. Civ.App., 99 S.W.2d 390; clear, strong and convincing, Dumas v. O'Leary, 152 Wash. 101, 277 P. 449, or clear, satisfactory and convincing, Winkelmann v. Luebbe, 151 Neb. 543, 38 N.W.2d 334; Sheets v. Huben, 354 Mich. 536, 93 N.W.2d 168.

The controlling principles which should govern the decision are stated in Galena Oaks Corporation v. Scofield, 5 Cir., 218 F. 2d 217, 219:

"* * * Insofar, however, as the so-called 'ultimate fact' is simply the result reached by process of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the restraining impact of the so-called "clearly erroneous" rule.' Lehmann v. Acheson, 3 Cir., 206 F.2d 592, 594. As succinctly stated by Professor Moore, *'Findings of fact that are induced by an erroneous view of the law are not binding*. Nor are findings that combine both fact and law, when there is error as to the law.' 5 Moore's Federal Practice 2d Ed., Sec. 52.03(3), p. 2631. * * *" (Emphasis supplied.)

Where the trial court has misconceived the burden of proof as here, its findings of fact and conclusions of law dependent thereon are so irredeemably tainted that they should be held to be devoid of any effectuality.

The trial court had, however, correctly instructed the jury as to the burden of proof in this language:

"* * * In this case the plaintiff has asserted that the written agreement constituted a pledge of stock, and the burden of proof as to that issue is therefore on the plaintiff. Your decision as to whether plaintiff has carried his burden of proof must be made according to whether or not that issue

has been proved to you by clear and convincing proof."

Because the trial court entered judgment in favor of the defendants under an erroneous view of the law while the jury was correctly instructed, this Court should reinstate the special findings and general verdict in favor of plaintiff and direct the entry of judgment in accordance therewith.

For the foregoing reasons I am of the opinion the judgment of the court below should be reversed.

BERNSTEIN, Vice Chief Justice (dissenting).

I cannot agree with the conclusion and reasoning of the majority that the transaction in issue was a sale. I do agree with the result reached by the Chief Justice, in his dissent, but again I cannot agree with his reasoning. Therefore, I am compelled to write a separate dissent setting out the criteria which I think must be considered in determining the question presented. The importance and magnitude of the issue presented requires me to set forth and discuss the doctrine of equitable mortgages.

There is no dispute in the facts of this case and therefore there is no necessity of setting them forth here, except to add one facet which apparently the majority disregarded. In order for Pendleton to give Merryweather the $200,000 needed, Pendleton applied to the Bank for a loan in that amount. The Bank, in allowing the loan, required that Merryweather's stock be transferred to Pendleton as the owner and in such form be pledged to the Bank as security.

The doctrine of equitable mortgage was established very early by the Courts of Chancery. Y.B. 9 Edw. IV, 25, 34 (1470)[1] It began when loaners of money tried to take away the equity of redemption by insisting upon an absolute deed as security for money loaned rather than a conveyance with a defeasance clause. Equity intervened and preserved the "grantor's" redemption rights. The relief granted by the equity courts was attributive to the maxim, "Equity considers that as done which ought to be done."

When a transaction is established to be a mortgage upon real property, the mortgagee, in order to terminate the equity of redemption which the mortgagor has in the property must comply with the Arizona statutory provisions regarding foreclosure by judicial sale.[2] Often an attempt is made to avoid these requirements, as I believe is the case before us, by employing an abso-

1. This is the earliest recorded case where the law court stated that the Chancellor would give relief. It was a case which involved an absolute conveyance, made, in fact, to secure a loan, but unenforceable as a mortgage at law because of the lack of a defeasance clause.

2. A.R.S. § 33-721 (1956).

lute deed with some type of collateral agreement, express or implied, that the "grantor" may regain the property upon complying with certain conditions. By proceeding in such a manner it is hoped that the "grantor's" common law equity of redemption as well as his six-months statutory right to redeem after foreclosure sale [3] may be precluded ab initio. Tansil v. McCumber, 201 Iowa 20, 206 N.W. 680 (1925); Wiswell v. Simmons, 77 Kan. 622, 95 P. 407 (1908); Halbert v. Turner, 233 Ill. 531, 84 N.E. 704 (1908).

When such an absolute conveyance is employed by the parties the grantor has no legal remedy since the deed is absolute at law. Cohn v. Krauss, 67 N.E.2d 62 (Ohio. App.1943); Walsh, Mortgages 35 (1934); 5 Tiffany, Real Property 659, 660 (3d ed. 1939). However, in such a case equity will look to the substance of the transaction and give effect to the intention of the parties; if it is established that the parties intended the deed to be executed as security, an equitable mortgage will be declared. Britz v. Kinsvater, 87 Ariz. 385, 351 P.2d 986 (1960); DeWulf v. Bissell, 83 Ariz. 68, 316 P.2d 492 (1957); Rogers v. Greer, 70 Ariz. 264, 219 P.2d 760 (1950); Coffin v. Green, 21 Ariz. 54, 185 P. 361 (1919); see A.R.S. § 33–702 (1956).

The burden of proving a deed absolute on its face to be merely a form of security is upon the grantor, since he is usually the one seeking to establish the equitable mortgage.[4] Britz v. Kinsvater, supra. Such proof consists in determining the intent of the parties. The intent of the parties is largely determined by considering all the circumstances relevant to the execution of the transaction. Britz v. Kinsvater, supra; Rogers v. Greer, supra; Farrell v. West, 57 Ariz. 332, 113 P.2d 866 (1941), modified on other grounds 57 Ariz. 490, 114 P.2d 910; Sullivan v. Woods, 5 Ariz. 196, 50 P. 113 (1897).

What must be present in order to create an equitable mortgage? There first must be a debt and this debt must continue and subsist after the conveyance. The debt need not exist as such at the time of the conveyance where it is intended that the relationship of debtor-creditor is to be established at its inception. The requirement "existence of a debt" thus can include a contemplated existence of a debt at the time of conveyance. Charter Gas Engine Co. v. Entrekin, 30 Ariz. 341, 246 P. 1038 (1926); Kolar v. Eckhardt, 119 Kan. 518, 240 P. 947 (1925); Tansil v. McCumber, supra. In order to determine whether a debt existed and continued and whether the

---

3. A.R.S. § 12–1282 (1956).
4. In Charter Gas Engine Co. v. Entrekin, 30 Ariz. 341, 246 P. 1038 (1926), where the "grantee" of an absolute deed with an option to purchase brought action to have the transaction established as an equitable mortgage.

transaction was, in fact, a mortgage, the court should consider the following factors persuasive: (1) the prior negotiations of the parties, to discern if such negotiations contemplated a mere security for a debt;[5] (2) the distress of the maker;[6] (3) the fact that the amount advanced was about the amount that the "grantor" needed to pay an existing indebtedness;[7] (4) the amount of the consideration paid in comparison to the actual value of the property in question;[8] (5) a contemporaneous agreement to repurchase;[9] and (6) the acts of the parties in relation to each other, i. e., whether their acts are ordinarily indicative of a vendor-purchaser relationship or that of a mortgagor and mortgagee.

While none of the above is conclusive of the issue, nevertheless, a combination of several will go a long way in showing that the deed was, in fact, intended as a mort-gage. In this connection it is worthwhile to note that in doubtful cases the courts likely will lean toward the conclusion that a security was meant rather than a sale, because this subserves the ends of abstract justice and averts serious consequences. Tansil v. McCumber, supra; Perry v. Southern Surety Co., 190 N.C. 284, 129 S.E. 721 (1925); Wiswell v. Simmons, 77 Kan. 622, 95 P. 407 (1908).

In analyzing the undisputed facts in this case with the above factors in mind, we find that Merryweather in July 1954 became indebted to one Haggard for $180,000 payable in 30 days with Merryweather's stock pledged as security. Finding himself in financial stress to pay off the loan, Merryweather negotiated for a loan with Pendleton.[10] This culminated in an agreement whereby Pendleton would loan Merry-

---

5. Tansil v. McCumber, supra; 41 C.J., Mortgages, § 100 (1927).
6. Kemp v. Earp, 42 N.C. 167 (1850).
7. In Tansil v. McCumber, the Iowa court found that it was the typical case of a debtor in distress applying to a money lender for assistance and the lender advancing enough money to pay off the debtor's indebtedness. The court held that in such circumstances "The law implied a promise by [defendant] to pay back the amount so advanced with interest, and this established the relationship of debtor and creditor, as much so as if [plaintiff] had directly loaned the money to [defendant] and delivered it to him and the latter had in turn paid it on the mortgage." [201 Iowa 20, 206 N.W. 685]

8. Walsh, Mortgages, 38–40 (1934).
9. Handrub v. Griffin, 127 Kan. 782, 275 P. 196 (1929). It is with this point that I most strongly disagree with the dissent of the Chief Justice, wherein he states: "The general rule is that an absolute deed will be held to be a mortgage where it conveys an estate subject to defeasance." It is not the general rule. Conditional sales, determinable fees and possibility of reverter all take the form of an absolute deed subject to defeasance. To hold that, prima facie, they are mortgages as the Chief Justice does would thwart our rules of property law and would conflict with A.R.S. § 33–702 (1956).
10. See the majority opinion for the prior acts of the parties in connection with the stock in issue.

weather $180,000 at 5% interest on Merryweather's stock. Before Merryweather was to accept this loan, his indebtedness to Haggard increased to $220,000. In late 1954 Merryweather attempted to get Pendleton to increase the proposed loan to $200,000. It was at this time that Pendleton indicated that he would "buy" the stock instead of loaning the money. Pendleton stated his reasons for this change was to avoid the trouble of foreclosure. At this point it is important to note that in order for Pendleton to advance $200,000 to Merryweather, Pendleton applied to the bank for a loan in that amount. The bank before loaning the money to Pendleton for this purpose required that Merryweather's stock be transferred to Pendleton. On these terms of Pendleton, the parties entered into the transaction in question in January of 1955. Thereafter, Pendleton treated Merryweather in the same manner as when he was the owner of the stock and a director in the corporation. On Pendleton's order all information of the corporation was made available to Merryweather as before, and during the year after the "purported sale" no money was paid to other stockholders for the reason that Merryweather should have the opportunity to share in the profits when he got his stock back. It thus is apparent that there is present all the factors needed and required in showing that the transaction was a mortgage.

First, the relation of the amount loaned to the actual value of the stock. By taking the value found by the trial court, though I do not agree with the court's finding;[11] and comparing it with the $200,000 Pendleton "paid for it," it is found that the amount loaned was only 51%[12] of the actual value. This factor alone should indicate a mortgage was intended. "In deciding whether a deed absolute on its face is a mortgage in equity subject to the right of redemption, the court is called on to decide a question of fact as to whether the transaction was a sale for a price or a pledging of the property as security for the repayment of the money advanced as a loan. The most important evidential fact is the relation of the amount advanced to the value of the property conveyed. A loan secured by a mortgage is usually about sixty per cent of the fair appraised value of the mortgaged property. Proof that the amount paid or advanced by the grantee is very considerably less than the fair market value of the property is * * * evidence that the transaction was a mortgage and not a sale * * *." Walsh, Mortgages, 38, 39 (1934).

Second, the transaction had its inception in an application for a loan, and after the transaction was consummated the parties'

---

11. The jury found that the stock in question was worth $630,000.

12. It would be 32% if related to the value found by the jury.

acts in relation to each other and the corporation were the same as before except that on the books Merryweather was no longer a stockholder or director. The law of the corporation prevented a non-stockholder from being a director. Nevertheless, Merryweather was informed of the business of the directors. In Tansil v. McCumber, supra, the court quoted with approval the following:

> " 'When the transaction had its inception in an application for a loan the courts are inclined to scrutinize it closely and to hold it a mortgage, unless it clearly appears the parties changed their minds afterwards.' Williamson v. Frazee, 294 Mo. 320, 242 S. W. 958."

It is apparent from the record on appeal that the parties did not change their minds after the loan negotiations, but entered into this specific type of transaction for the sole purpose of saving Pendleton the trouble of foreclosure and to comply with the requirements of the bank for Pendleton's loan. Wiswell v. Simmons, supra.[13]

Based on the undisputed facts and the law as herein outlined, the only conclusion that can be reached is that an equitable mortgage existed between the parties. Any other conclusion, such as that reached by

13. This case is on all fours with the case before us including the grantee's admission that he thought by an absolute deed he would save himself the trouble and

the majority, would give Pendleton more than he bargained for and take from Merryweather all he had. In cases such as this our policy should be: *There will be no fleecing a grantor out of his equity of redemption.*

The judgment should be reversed and an equitable mortgage declared to exist.

expense of foreclosure. The court seeing through the transaction declared that an equitable mortgage was created.